# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HOWMET CORPORATION | |
| Plaintiff, | |
| v. | Case No. 1:07-cv-01306 (EGS) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and STEPHEN L. JOHNSON, Administrator | *Next Scheduled Court Deadline: Amicus Briefs Due 08/25/2008* |
| Defendants. | |

## PLAINTIFF HOWMET CORPORATION'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE

I. STATEMENT OF MATERIAL FACTS .................................................................2

II. NATURE OF THE CASE................................................................................5

    A.    APPLICABLE LAW AND REGULATIONS ............................................5

    B.    SUMMARY OF THE PARTIES' CONTENTIONS .............................6

    C.    SUMMARY OF THE ALJ'S RULING ..............................................8

    D.    SUMMARY OF THE EAB'S FINAL DECISION ...............................9

III. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
    FOR SUMMARY JUDGMENT ........................................................................9

    A.    THE MATERIAL IN QUESTION IS NOT A SPENT MATERIAL UNDER THE
        PLAIN LANGUAGE OF THE APPLICABLE REGULATION..............9

    B.    THE EAB GAVE INSUFFICIENT CONSIDERATION TO THE PLAIN LANGUAGE
        OF THE REGULATION AND IMPROPERLY CONSIDERED MATTERS OUTSIDE
        OF THE REGULATION BEFORE CONSIDERING THE REGULATORY TEXT
        ITSELF.....................................................................................15

        1.    The EAB's Analysis Was Flawed And Biased By Its Premature
            And Incorrect Treatment Of Howmet's Used KOH As A
            Secondary Material ...........................................................17

        2.    The EAB Erred By Relying On The Regulatory History Of The
            "Spent Material" Definition Before The Board Even Considered
            The Plain Language Of The Regulation Itself ......................20

        3.    The EAB Failed To Give Due Consideration To The Plain
            Language Of "The Spent" Material Definition.........................21

    C.    PUBLISHED EPA STATEMENTS AND ADMINISTRATIVE MATERIALS SUPPORT
        HOWMET'S READING OF THE PLAIN LANGUAGE THE "SPENT MATERIAL"
        DEFINITION...............................................................................23

        1.    EPA's Statements In The Preamble To The Spent Materials
            Regulation Support A Finding That Howmet's Used KOH Is Not
            A Spent Material ...............................................................23

        2.    The Regulations Preceding The Spent Materials Regulation
            Provide No Support For EPA's Construction of The "Spent
            Material" Definition...........................................................26

        3.    EPA's Prior Construction Of The "Spent Material" Definition Is
            At Odds With The Interpretation Put Forth By EPA In This Case...........29

    D.    HOWMET WAS NOT GIVEN FAIR NOTICE OF THE INTERPRETATION PUT
        FORTH BY EPA IN THIS MATTER .........................................32

IV. CONCLUSION.......................................................................................36

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n,*
212 F.3d 1301 (D.C. Cir. 2000) ............................................................................ 32

*Am. Fed'n of Gov't Employees, AFL-CIO v. Glickman,*
215 F.3d 7 (D.C. Cir. 2000) ................................................................................. 22

*Am. Trucking Ass'ns, Inc. v. United States,*
602 F.2d 444 (D.C. Cir. 1979) ........................................................................ 15, 22

*American Mining Congress v. EPA,*
824 F.2d 1177 (D.C. Cir. 1987) ........................................................................... 31

*Ass'n of Am. R.Rs. v. Costle,*
562 F.2d 1310 (D.C. Cir. 1997) ........................................................................... 21

*Auer v. Robbins,*
519 U.S. 452 (1997) ............................................................................................. 21

*Bowles v. Seminole Rock & Sand Co.,*
325 U.S. 410 (1945) ....................................................................................... 21, 23

*California ex rel. Brown v. Watt,*
668 F.2d 1290 (D.C. Cir. 1981) ........................................................................... 15

*Cape Hatteras Access Pres. Alliance v. United States Dep't of the Interior,*
344 F. Supp. 2d 108 (D.D.C. 2004) ..................................................................... 21

*\*Christensen v. Harris Co.,*
529 U.S. 576 (2000) ...................................................................................... 10, 15

*\*Dialysis Clinic, Inc. v. Leavitt,*
518 F. Supp. 2d 197 (D.D.C 2007) ............................................................... passim

*Diamond Roofing Co. v. OSHRC,*
528 F.2d 645 (5th Cir. 1976) ............................................................................... 33

*\*Fina Oil & Chem. Co. v. Norton,*
332 F.3d 672 (D.C. Cir. 2003) ...................................................................... 9, 10, 16

*FTC v. Atlantic Richfield Co.,*
567 F.2d 96 (D.C. Cir. 1977) ............................................................................... 35

*Gardebring v. Jenkins,*
485 U.S. 415 (1988) ...................................................................................... 10, 16

*Gates & Fox Co. v. OSHRC,*
790 F.2d 154 (D.C. Cir. 1986) ........................................................................ 33, 34

*General Elec. Co. v. EPA,
   53 F.3d 1324 (D.C. Cir. 1995) ................................................................ 32, 33, 34, 36

Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,
   530 U.S. 1, 120 S.Ct. 1942, L.Ed.2d 1 (2000) ................................................... 16

In re Bil-Dry Corp.,
   9 E.A.D. 575 (EAB 2001) ................................................................................... 15

*In re Sealed Case,
   237 F.3d 657 (D.C. Cir. 2001) ............................................................ 9, 10, 15, 23

Kent Nowlin Constr. Co. v. OSHRC,
   593 F.2d 368 (10th Cir. 1979) ............................................................................ 33

L. R. Willson & Sons, Inc. v. Donovan,
   685 F.2d 664 (D.C. Cir. 1982) ............................................................................ 33

*Lamie v. United States Tr.,
   540 U.S. 526 (2004) ......................................................................... 15, 16, 27, 33

Lawrence v. Staats,
   640 F.2d 427 (D.C. Cir. 1981) ............................................................................ 15

McElroy Elecs. Corp. v. F.C.C.,
   990 F.2d 1351 (D.C. Cir. 1993) ................................................................... 33, 35

Petry v. Block,
   697 F.2d 1169 (D.C. Cir. 1983) ......................................................................... 16

Pfizer Inc. v. Heckler,
   735 F.2d 1502 (D.C. Cir. 1984) ................................................................... 10, 21

Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.,
   351 F.3d 1229 (D.C. Cir. 2003) ......................................................................... 15

Rollins Envtl. Servs. (NJ) Inc. v. EPA,
   937 F.2d 649 (D.C. Cir. 1991) ............................................................................ 34

S.G. Loewendick & Sons, Inc. v. Reich,
   70 F.3d 1291 (D.C. Cir. 1995) ............................................................................ 35

Sierra Club v. Leavitt,
   355 F. Supp. 2d 544 (D.D.C 2005) ............................................................. 10, 15

Sierra Club v. Mainella,
   No. Civ. A. 04-2012 JDB, 2005 WL 3276264 (D.D.C. Sept. 1, 2005) ............... 10, 15, 16, 20

Stinson v. United States,
   508 U.S. 36 (1993) .............................................................................................. 9

T.S. v. Bd. of Educ.,
   10 F.3d 87 (2d Cir. 1993) ................................................................................... 15

*Thomas Jefferson Univ. v. Shalala,
   512 U.S. 504 (1994) ................................................................................... passim

*Trinity Broad. of Fla., Inc. v. FCC*,
   211 F.3d 618 (D.C. Cir. 2000) ........................................................................ 32, 33

*U.S. v. Hoechst Celanese Corp.*,
   128 F.3d 216 (4th Cir. 1997) ............................................................................... 34

*U.S. v. Hoechst Celanese Corp.*,
   964 F. Supp. 967 (D.S.C. 1996),
   *rev'd in part on other grounds* 128 F.3d 216 (4th Cir. 1997)..................... 33, 34, 36

*U.S. v. Trident Seafoods Corp.*,
   60 F.3d 556 (9th Cir. 1995) .................................................................................. 33

*United Scenic Artists, Local 829, Bhd. of Painters & Allied Trades, AFL-CIO v. NLRB*,
   762 F.2d 1027 (D.C. Cir. 1985) ...................................................................... 15, 23

*United States ex rel. Totten v. Bombardier Corp.*,
   380 F.3d 488 (D.C. Cir. 2004) .............................................................................. 16

*United States v. Chrysler Corp.*,
   158 F.3d 1350 (D.C. Cir. 1998) ...................................................................... 32, 36

*United States v. Chrysler Corp.*,
   995 F. Supp. 150 (D.D.C. 1998), *rev'd in part on other grounds*, 158 F.3d1350 (D.C. Cir.
   1998) ................................................................................................................ 33, 34

*United States v. Granderson*,
   511 U.S. 39 (1994) ............................................................................................... 33

*Wyoming Outdoor Council v. United States Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) ............................................................................... 21

*Zerilli v. Evening News Ass'n*,
   628 F.2d 217 (D.C. Cir. 1980) .............................................................................. 16

**Statutes**

42 U.S.C. §§ 6901-6992k ....................................................................................... 1

42 U.S.C. § 6902(a) ................................................................................................ 5

42 U.S.C. § 6902(a)(4)-(6) ...................................................................................... 5

42 U.S.C. § 6903(5) ................................................................................................ 6

42 U.S.C. § 6903(27) .......................................................................................... 6, 31

**Regulations**

40 C.F.R. § 22.24(a) ......................................................................................... 13, 14

40 C.F.R. § 22.31(a) ............................................................................................... 4

40 C.F.R. § 261.1(c)(1) ................................................................................... passim

40 C.F.R. § 261.2(a)(1) .......................................................................................... 32

40 C.F.R. § 261.2(b)(2) .......................................................................................... 27

40 C.F.R. § 261.2(c)(1)(B)................................................................................ 6

40 C.F.R. § 261.2(e)(1)(ii) ............................................................................... 26

40 C.F.R. § 261.3 ............................................................................................ 6

40 C.F.R. § 261.22(a)(1) ................................................................................. 3

40 C.F.R. § 262.11 .......................................................................................... 13

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOWMET CORPORATION<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY and<br>STEPHEN L. JOHNSON, Administrator<br><br>     Defendants. | Case No. 1:07-cv-01306 (EGS)<br><br>*Next Scheduled Court Deadline:*<br>*Amicus Briefs Due 08/25/2008* |

**PLAINTIFF HOWMET CORPORATION'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

COMES NOW, Plaintiff Howmet Corporation ("***Howmet***") and files this Motion for Summary Judgment. As set forth below, there is no material fact in dispute and, as a matter of law, Howmet is entitled to a judgment in its favor on all pending claims.

The agency action at issue in this case is the final determination of the United States Environmental Protection Agency ("***EPA***" or the "***Agency***") that Howmet is liable, and should be assessed civil penalties, for violations of the Resource Conservation and Recovery Act ("***RCRA***") and state and federal regulations implementing RCRA.[1] In this case, EPA unlawfully asserts RCRA jurisdiction over a material where (*i*) the material was produced for the purpose of

---

[1]  As generally used and commonly understood, "RCRA" includes the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992k, as amended by the 1976 Resource Conservation and Recovery Act and the 1984 Hazardous and Solid Waste Amendments.

 As set forth below, the violations claimed by EPA allegedly took place in Texas and New Jersey. Those two states have EPA-authorized hazardous waste management programs with regulations that mirror EPA's federal RCRA regulations, at least with respect to the issues in this case. For ease of citation, Howmet cites only to the federal statute and regulations; such citations are intended to incorporate state counterpart laws and regulations as well. Both parties took the same approach in the proceedings below.

serving multiple uses; (*ii*) although having been used in one application, the material is still fit to be reused in another application that the material was produced to serve; (*iii*) the material can be reused in such other application without processing; and (*iv*) the applicable regulation limits EPA's jurisdiction to a used material that can no longer serve the purpose for which it was produced without processing. EPA's interpretation of the applicable regulation is contrary to its plain meaning. Moreover, even assuming, *arguendo*, that the regulation can be construed to extend EPA's RCRA jurisdiction to such materials, Howmet was not given fair notice of that construction.

For the foregoing reasons, as set forth more fully below, EPA has acted arbitrarily and capriciously, in excess of the Agency's statutory jurisdiction and its own regulations, and contrary to constitutional principles of due process. Accordingly, the Agency's action should be held unlawful and set aside.

## I.
## STATEMENT OF MATERIAL FACTS

The undisputed material facts of this case are set forth in the joint stipulations that the parties filed in the record of the administrative proceedings below.[2] The following is a summary of the relevant facts.

This case arose from Howmet's shipment of a used liquid potassium hydroxide ("**KOH**") solution to Royster-Clark ("**Royster**") for use by Royster in manufacturing land-applied tobacco fertilizer. At its facilities in Dover, New Jersey, and Wichita Falls, Texas, Howmet

---

[2]     *See* Joint Stipulations, *In re Howmet Corp.*, EPA Region 2 Docket No. RCRA-02-2004-7102, R. Doc. 22 [hereinafter ***Region 2 Joint Stipulations***]; Stipulation of Facts, *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, (appended to) R. Doc. 31 [hereinafter ***Region 6 Stipulation of Facts***]; *see also See* Final Decision, *In re Howmet Corp.*, RCRA (3008) Appeal No. 05-04, EAB R. Doc. 17, at 13 [hereinafter ***EAB Final Decision***] ("Because the parties have stipulated to the facts in this case, no facts are at issue before the Board."); EPA's Response Brief to Howmet's Appeal of Initial Decision, *In re Howmet Corp.*, RCRA (3008) Appeal No. 05-04, EAB R. Doc. 3, at 4, 14 [hereinafter ***EPA's EAB Brief***] ("There were and remain no genuine issues of any material facts.").

manufactures precision investment castings for aerospace and industrial gas turbine applications.[3]  In its manufacturing operations, Howmet utilizes an aqueous KOH solution to clean ceramic core from the metal castings, and continually uses or reuses the KOH solution until the solution can no longer effectively be employed for Howmet's use without being reclaimed or otherwise processed.[4]  The used KOH solution exhibits a hazardous characteristic, in that it is corrosive as defined by EPA's regulations, having a pH equal to or greater than 12.5.[5]

For certain periods, Howmet would either ship the used KOH to an authorized hazardous waste disposal facility or to Royster, depending solely upon Royster's demand for KOH for use in its fertilizer manufacturing process.[6]  In Royster's operations, the used KOH was a source of potassium in, and controlled (i.e., neutralized) the pH of, Royster's fertilizer mixture.[7]  Royster did not process or otherwise treat or reclaim the used KOH prior to adding it to the fertilizer mixture; Royster used the KOH as received from Howmet.[8]

Based on the foregoing facts, EPA's Region 2 and Region 6 regional offices (collectively, the "**Regions**") brought enforcement actions against Howmet for alleged violations

---

[3]      *See* Region 2 Joint Stipulations, *supra* note 2, ¶¶ 3, 4; Region 6 Stipulation of Facts, *supra* note 2, ¶¶ 3, 4.

[4]      *See* Region 2 Joint Stipulations, *supra* note 2, ¶¶ 11, 12; Region 6 Stipulation of Facts, *supra* note 2, ¶¶ 10, 11.

[5]      *See* Region 2 Joint Stipulations, *supra* note 2, ¶¶ 15, 26; Region 6 Stipulation of Facts, *supra* note 2, ¶¶ 14, 22; *see also* 40 C.F.R. § 261.22(a)(1).  As set forth below, the hazardous characteristic of the KOH solution alone is not determinative of whether the KOH solution is a hazardous waste.

[6]      *See* Region 2 Joint Stipulations, *supra* note 2, ¶¶ 13, 14; Region 6 Stipulation of Facts, *supra* note 2, ¶¶ 12, 13.

[7]      *See* Region 2 Joint Stipulations, *supra* note 2, ¶ 19; Region 6 Stipulation of Facts, *supra* note 2, ¶ 18.

[8]      *See* Region 2 Joint Stipulations, *supra* note 2, ¶¶ 18, 19; Region 6 Stipulation of Facts, *supra* note 2, ¶¶ 17, 18; *see also* Complainant U.S. EPA Region 2's Mem. of Law in Supp. of Complainant's Mot. for Partial Accelerated Dec., *In re Howmet Corp.*, EPA Region 2 Docket No. RCRA-02-2004-7102, R. Doc. 20, at 12 [hereinafter **Region 2 Mem.**] (discussing Royster's use of the used KOH).

of RCRA and federal and state regulations implementing RCRA.[9]  Because Howmet contested

the allegations and requested a hearing, the enforcement actions were brought before an EPA

Administrative Law Judge ("*ALJ*").[10]  The ALJ consolidated the two regional cases and,

following briefing by the parties on the issue of liability, issued an order finding Howmet liable

for the alleged violations.[11]  The parties stipulated to a civil penalty of $309,091, and Howmet

appealed the ALJ's order to EPA's Environmental Appeals Board ("*EAB*" or the "*Board*").[12]

Following additional briefing and oral argument, the EAB upheld the ALJ's findings and

assessed Howmet the stipulated civil penalty.[13]

        The EAB's decision constituted EPA's final action in the consolidated enforcement

proceeding.[14]  Howmet is before this Court seeking judicial review of that final agency action.

---

[9]        *See* Compl., Compliance Order and Notice of Opportunity for Hr'g, *In re Howmet Corp.*, EPA Region 2 Docket No. RCRA-02-2004-7102, R. Doc. 1; Compl., Compliance Order and Notice of Opportunity for Hr'g, *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 1.

[10]       *See* Resp't Howmet Corp.'s Answer, *In re Howmet Corp.*, EPA Region 2 Docket No. RCRA-02-2004-7102, R. Doc. 2; Resp't Howmet Corp.'s Answer, *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 2; *see also* 40 C.F.R. § 22.15(c).

[11]       *See* Order Granting Consolidation, and Approval of Supplemental Joint Motion for Filing Schedule, *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 30; Region 2 Mem., Complainant U.S. EPA Region 6's Mem. of Law in Supp. of Mot. for Partial Accelerated Dec., *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 31 [hereinafter *Region 6 Mem.*]; Howmet's Br. in Opp'n to Complainants' Mot. for Partial Accelerated Dec. and to Strike Affirmative Defenses and in Supp. of Respondent's Mot. to Dismiss, *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 35 [hereinafter *Howmet's Initial Br.*]; Order on Mots., *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 38 [hereinafter *ALJ's Order on Mots.*]; *see also* Initial Decision, *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 55.

[12]       *See* Joint Stipulation on Penalty Amount, *In re Howmet Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 48; Howmet Corp.'s Notice of Appeal, *In re Howmet Corp.*, RCRA (3008) Appeal No. 05-04, EAB R. Doc. 1.

[13]       *See* EAB Final Decision, *supra* note 2, at 4, 14, 49.  The EAB's Final Decision also discusses the foregoing undisputed facts in somewhat greater detail.  *See id.* at 7-9.

[14]       *See* 40 C.F.R. § 22.31(a) (providing that the final order of the EAB constitutes EPA's final agency action in a proceeding).

## II.
## NATURE OF THE CASE

### A.    APPLICABLE LAW AND REGULATIONS

The overarching goals of RCRA are twofold: (1) the protection of human health and the environment and (2), as the statute's name suggests, the promotion of resource conservation and recovery.[15]  With respect to hazardous waste, RCRA's stated objectives are to assure that such waste is properly managed, and to minimize hazardous waste generation "by encouraging process substitution, materials recovery, properly conducted recycling and reuse, and treatment."[16]  EPA has referred to the latter of these two objectives as "RCRA's overall objective of promoting the use, re-use, recycling and reclamation of wastes."[17]  As the Agency has recognized, the benefits to encouraging and facilitating such activities are far-reaching: "The use, re-use, recycling and reclamation of wastes not only helps preserve valuable natural resources and reduces the environmental problems which stem from the exploitation of those resources, but, if properly conducted, may eliminate or reduce some of the hazards associated with other types of waste management and alleviate the strain on national [waste] disposal capacity."[18]

Pursuant to RCRA, EPA promulgated regulations defining what constitutes a "hazardous waste."  Consistent with the statutory definition of hazardous waste, EPA's regulations define

---

[15]     *See* 42 U.S.C. § 6902(a) ("The objectives of [RCRA] are to promote the protection of health and the environment and to conserve valuable material and energy resources . . . ."); *see also* 45 Fed. Reg. 33,084, 33,094 (May 19, 1980) (referring to "RCRA's dual goals of protecting human health and the environment and promoting resource conservation and recovery").

[16]     42 U.S.C. § 6902(a)(4)-(6).

[17]     45 Fed. Reg. at 33,091.

[18]     *Id.*

hazardous waste as a subset of solid waste.[19]  A material cannot be regulated by EPA under RCRA as a hazardous waste unless that material is first determined to be a solid waste.[20]

RCRA defines "solid waste" to include any "discarded material."[21]  EPA has, in turn, promulgated a definition of "discarded material" which provides, in part, that discarded materials include "spent materials" that are "[u]sed to produce products that are applied to or placed on the land or are otherwise contained in products that are applied to or placed on the land."[22]  Per EPA's regulations, a "spent material" is "any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing."[23] The crux of this case concerns EPA's interpretation of this single-sentence "spent material" definition.[24]

B.    SUMMARY OF THE PARTIES' CONTENTIONS

EPA contends that the used KOH that Howmet sent to Royster was a hazardous waste subject to regulation under RCRA, and that Howmet's shipments of used KOH to Royster failed to comply with certain RCRA regulations.  The dispute in this case is focused on EPA's waste determination.  Howmet contends that the used KOH sent to Royster was not a solid waste and, therefore, not a hazardous waste subject to EPA's RCRA jurisdiction.

---

[19]    *See* 42 U.S.C. § 6903(5); 40 C.F.R. § 261.3.

[20]    *See* 45 Fed. Reg. at 33,090 ("Because no material can be a 'hazardous waste' without first being a 'solid waste' . . ., what constitutes a 'solid waste' is really the definitional starting point for the hazardous waste management system."); EAB Final Decision, *supra* note 2, at 5 ("If a substance does not meet the threshold definition of 'solid waste,' it cannot be 'hazardous waste' or subject to the RCRA hazardous waste regulations."); EPA's EAB Brief, *supra* note 2, at 7 ("The definition of solid waste is the keystone in determining the parameters of EPA's [RCRA] jurisdiction" over hazardous materials.).

[21]    42 U.S.C. § 6903(27).

[22]    40 C.F.R. § 261.2(c)(1)(B).

[23]    *Id.* § 261.1(c)(1).

[24]    *See* EAB Final Decision, *supra* note 2, at 6 ("[T]he outcome of this appeal hinges on whether the materials in question were 'spent' and therefore solid waste.").

EPA's position that Howmet's used KOH was a hazardous waste follows from, and is dependent upon, the Agency's claim that Howmet's used KOH was a spent material.  Because the used KOH was used by Royster to produce a land-applied fertilizer, EPA contends that the used KOH was a "discarded material" and, therefore, a solid waste.  Because the used KOH exhibited the characteristic of corrosivity when it was sent to Royster, EPA contends that it was a hazardous waste.  As noted above, Howmet does not dispute that the used KOH was used to produce a land-applied product, or that it was characteristically corrosive prior to being neutralized in Royster's process.  Rather, Howmet disputes EPA's determination that the used KOH was a spent material.

Specifically, the dispute in this case, as in the administrative proceedings below, is limited to (1) whether EPA has lawfully interpreted its "spent material" definition and (2), if so, whether Howmet was given fair notice of that interpretation.[25]  Neither party disputes that, if EPA misinterpreted the "spent material" definition as applied to Howmet's used KOH, then the used KOH cannot properly be considered a waste (i.e., neither a solid nor hazardous waste) subject to regulation under RCRA.[26]

Relying upon the plain wording of the "spent material" definition in EPA's regulations, Howmet asserts that the focus in this case should be upon the purpose for which KOH is produced to serve.[27]  EPA, on the other hand, claims that the "production" process at issue in this case is Howmet's "production" of *used* KOH.[28]  Whereas EPA contends that the "purpose for

---

[25]    *See id.* at 1, 13; EPA's EAB Brief, *supra* note 2, at 3.

[26]    *See* EAB Final Decision, *supra* note 2, at 6 n.16 ("If the materials were not spent, then they would not be considered solid waste and could therefore not be regulated as hazardous waste.").

[27]    *See* Howmet's Initial Br., *supra* note 11, at 5.

[28]    *See* EAB Final Decision, *supra* note 2, at 26 & n.38, 32, 39; EPA's EAB Brief, *supra* note 2, at 20; Complainants' Reply to Respondent's Br. in Opp'n to Complainants' Mots. for Partial Accelerated Dec. and to Strike Affirmative Defenses and in Supp. of Respondent's Mot. to Dismiss, *In re Howmet*

which" a material "was produced" should be governed by the first *use* that is made of the material,[29] Howmet takes the opposite position, arguing that one's *use* of a material cannot define or otherwise change the *purpose* that the material was produced to serve.[30]  Howmet maintains that any reasonable interpretation of the "spent material" definition must account for materials, like KOH, that are produced for the purpose of serving multiple uses.[31]  On the other hand, EPA's interpretation of the same definition would hold that a multi-use material is no longer fit for use if it cannot continue to serve the purpose for which it was initially *used*, despite the fact that the material may still be fit for use in one or more other uses for which it was *produced*.[32]

### C.    SUMMARY OF THE ALJ'S RULING

The EPA ALJ in the initial proceeding below ruled that the used KOH that Howmet shipped to Royster was a spent material "under a plain reading of the applicable regulations," as advocated by the Regions.[33]  Additionally, relying upon his reading of various D.C. Circuit decisions, the ALJ concluded that, to avoid regulation as a solid waste, Howmet's used KOH would have to be used in an "ongoing, continuous process of beneficial reuse by Howmet."[34]

---

*Corp.*, EPA Region 6 Docket No. RCRA-06-2003-0912, R. Doc. 36, at 4-5 [hereinafter ***EPA's Initial Reply Brief***]; Region 2 Mem., *supra* note 8, at 18; Region 6 Mem., *supra* note 11, at 13.

[29]     *See, e.g.*, EAB Final Decision, *supra* note 2, at 11, 26 & n.38, 29-30, 32, 33 n.49, 39; EPA's EAB Brief, *supra* note 2, at 9, 16; Region 2 Mem., *supra* note 8, at 8, 15, 17; Region 6 Mem., *supra* note 11, at 5, 12.

[30]     *See* Howmet's Initial Br., *supra* note 11, at 6.

[31]     *See id.* at 10.

[32]     *See, e.g.*, Region 2 Mem., *supra* note 8, at 8, 17; Region 6 Mem., *supra* note 11, at 5, 12.

[33]     ALJ's Order on Mots., *supra* note 11, at 14-15, 21; *see also* EPA's EAB Brief, *supra* note 2, at 3 (arguing that the ALJ "correctly held that Howmet's used KOH constituted a spent material based on the plain wording of the regulation").

[34]     *Id.*

**D.    SUMMARY OF THE EAB'S FINAL DECISION**

On appeal of the ALJ's ruling, the EPA's EAB upheld the ALJ's determination that Howmet was liable for the violations at issue, but the Board did not adopt the reasoning that the ALJ put forward to support his determination.  Indeed, except for the ultimate outcome, the EAB's decision differed markedly from that of the ALJ.  Whereas the ALJ's determination was premised on a "plain reading of the applicable regulations," the EAB found the regulatory language at issue to be ambiguous.[35]  Whereas the ALJ concluded that Howmet's used KOH must be used in an "ongoing, continuous process of beneficial reuse by Howmet" to avoid regulation as a solid waste, the EAB held that subsequent use of the material by a separate company (i.e., a company other than Howmet) was not determinative of whether the material should be regulated as a waste.[36]

### III.
### MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**A.    THE MATERIAL IN QUESTION IS NOT A SPENT MATERIAL UNDER THE PLAIN LANGUAGE OF THE APPLICABLE REGULATION**

EPA's construction of the term "spent material" is plainly erroneous and inconsistent with the regulatory definition of that term.  As such, it is not entitled to deference and carries no weight.[37]  An agency's interpretation of its own regulation is entitled to deference "*only* when the

---

[35]    *See* EAB Final Decision, *supra* note 2, at 28, 30-31 & n.44 ("Recognizing that the ALJ determined that the Regions' interpretation was compelled by the plain language of the regulation, . . . we disagree with the ALJ in this respect.")

[36]    *See id.* at 19 n.30 (holding that "the ALJ misconstrued D.C. Circuit case law to the extent that he concluded that the fact Royster was a separate company in a different industry was by itself determinative with respect to the waste status of Howmet's used KOH").  With respect to this holding, both Howmet and the Regions are in agreement with the EAB.  *See id.*

[37]    *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Stinson v. United States*, 508 U.S. 36, 45 (1993); *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 676 (D.C. Cir. 2003); *In re Sealed Case*, 237 F.3d 657, 667 (D.C. Cir. 2001); *Dialysis Clinic, Inc. v. Leavitt*, 518 F. Supp. 2d 197, 202 (D.D.C. 2007).

language of the regulation is ambiguous."[38]  A court may not defer to an agency's interpretation if "an 'alternative reading is compelled by the regulation's plain language.'"[39]  To defer to an agency's interpretation of an unambiguous regulation "would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation."[40]  That is precisely what EPA did in the context of the administrative proceedings below – rewrite the "spent material" definition, under the guise of interpreting it, to create through litigation what must be done through notice-and-comment rulemaking.[41]

As set forth below, the plain language of the "spent material" definition simply does not permit the interpretation put forth by EPA.  Because the language of the regulation is unambiguous, this Court owes no deference to EPA's interpretation.[42]

EPA's RCRA regulations, as discussed above, define a "spent material" as a "material that has been used and . . . can no longer serve the *purpose for which it was produced* without

---

[38]     *Christensen v. Harris Co.*, 529 U.S. 576, 588 (2000) (emphasis added); *see also In re Sealed Case*, 237 F.3d at 667; *Pfizer Inc. v. Heckler*, 735 F.2d 1502, 1509 (D.C. Cir. 1984) ("Under settled principles of statutory and rule construction, a court may defer to administrative interpretations of a statute or regulation *only* when the plain meaning of the rule itself is doubtful or ambiguous. . .  Deference to agency interpretations is not in order if the rule's meaning is clear on its face."); *Dialysis Clinic, Inc.*, 518 F. Supp. 2d at 202; *Sierra Club v. Mainella*, No. Civ. A. 04-2012 JDB, 2005 WL 3276264, at *10 & n.10 (D.D.C. Sept. 1, 2005); *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 548, 552 (D.D.C 2005).

[39]     *Thomas Jefferson Univ.*, 512 U.S. at 512 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)); *see also Fina Oil & Chem. Co.*, 332 F.3d at 679 (rejecting agency's regulatory interpretation that "conflicts with the regulation's plain language"); *Dialysis Clinic, Inc.*, 518 F. Supp. 2d at 202; *Sierra Club v. Mainella*, 2005 WL 3276264, at *10 n.10.

[40]     *Christensen*, 529 U.S. at 588; *see also Fina Oil & Chem. Co.*, 332 F.3d at 676, 679; *In re Sealed Case*, 237 at 669; *Dialysis Clinic, Inc.*, 518 F. Supp. 2d at 203.

[41]     *Cf. Fina Oil & Chem. Co.*, 332 F.3d at 679 (holding that, if the agency seeks to disallow "precisely what the regulation permits," the agency "should amend the regulations through notice-and-comment rulemaking, not under the guise of interpretation"); *Dialysis Clinic, Inc.*, 518 F. Supp. 2d at 202 (holding that the agency's interpretation "would effectively amend the regulation, thereby circumventing the notice-and-comment procedures required by the [Administrative Procedure Act].").

[42]     *See Christensen*, 529 U.S. at 588; *In re Sealed Case*, 237 F.3d at 667; *Dialysis Clinic, Inc.*, 518 F. Supp. 2d at 202; *Sierra Club v. Mainella*, 2005 WL 3276264, at *10; *Sierra Club v. Leavitt*, 355 F. Supp. 2d at 548, 552.

processing."[43]  There is no dispute that the KOH that Howmet sent to Royster had first been used by Howmet; nor is there any allegation that Royster processed the used KOH prior to using it in its fertilizer manufacturing operations.  The sole dispute is whether, in Royster's operations, the KOH could continue to "serve the purpose for which it was produced."

EPA attempts to avoid application of the plain meaning of the controlling regulatory phrase – "purpose for which it was produced" – electing instead to focus on the specific uses of KOH by Howmet and Royster.  The relevant question under the regulation is not whether Howmet and Royster utilized KOH for different uses, but rather whether the KOH that Royster obtained from Howmet was used by Royster for "the purpose for which [the KOH] was produced."[44]  Specifically, did the KOH, as employed in Royster's manufacturing process, continue to serve "the purpose for which" the KOH was produced to serve?

The interpretation put forward by EPA would effectively define the "purpose for which" a material "was produced" as the first use that is made of the material.  Such an interpretation impermissibly ignores the word "produced" and substitutes the word "used," such that the regulation is revised to read that a "spent material" is one that "has been used and . . . can no longer serve the purpose for which it was *used*."  This reading of the regulation is different from, and flatly inconsistent with, its plain meaning.[45]

The words "produced" and "used" are not synonyms and are not interchangeable.  Indeed, they are completely opposite concepts – i.e., create vs. consume.  Given the indisputable distinction between creation and consumption, one's use of a material simply cannot define or

---

[43]     40 C.F.R. § 261.1(c)(1) (emphasis added).

[44]     *Id.*

[45]     *Cf. Dialysis Clinic, Inc.*, 518 F. Supp. 2d at 205 ("The regulations at issue cannot bear the meaning that the [agency] assigns to them . . . .  Because the [agency's] interpretation of the regulations . . . was inconsistent with the plain language of the regulation, it was improper . . . .").

otherwise change the purpose for which the material was produced.  The use (i.e., consumption) of a material necessarily must occur *after* the material's production (i.e., creation).  The plain language of the "spent material" definition looks retrospectively to the material's intended purpose at the time of its production (i.e., to the purpose for which the material "*was* produced"), not prospectively to the first use that is made of the material following its production.

EPA further confuses the "production" and "use" of KOH by improperly focusing on the "production" of *used* KOH by Howmet, rather than the commercial production of unused KOH and the purpose for which KOH is produced to serve.  A *used* material is not "produced" to serve any purpose.  Rather, a used material is "produced" as a result of its use; there is no "purpose" for its production.  A material is not used for the purpose of creating the used material; it is used for the purpose that it was produced to serve.

Under the plain language of the applicable regulation, the unused material (here, KOH) is used and, once the material (here again, KOH) "can no longer serve the purpose for which it was produced without processing," the used material (i.e., the used KOH) is deemed a spent material pursuant to EPA's regulations and may then be subject to EPA's RCRA jurisdiction.[46]  Howmet does not produce KOH, which is the relevant production process for purposes of the "spent material" determination.   Rather, Howmet purchases KOH commercially for use in its manufacturing process.  Howmet is not a producer of KOH; it is a manufacturer that employed KOH in its manufacturing process and, when the strength of the KOH solution was no longer suitable for Howmet's use, it was used by Royster in its manufacturing process, without being

---

[46]       40 C.F.R. § 261.1(c)(1) .

reclaimed.[47]  Howmet's use of KOH is immaterial for purposes of determining whether the KOH purchased and used by Howmet could "no longer serve the purpose for which it was produced."[48]

EPA, who had the burden of proof in the enforcement proceedings below, has wholly failed to address this question.[49]  EPA refuses to consider, and did not consider, the purpose for which KOH is produced and whether the used KOH that Howmet sent to Royster could still continue to serve that purpose.[50]  EPA has simply ignored the commercial purpose, and multiple uses, for which the KOH purchased by Howmet was produced to serve.  EPA asserts that to do so would improperly shift the responsibility for determining when a material is a hazardous waste from the generator of the used material (e.g., Howmet) to the manufacturer of the commercial, unused material (e.g., the KOH manufacturer).  Here again, EPA fails to acknowledge the process prescribed by its own regulations.

Per EPA's regulations, the generator of a solid waste must determine if its waste is hazardous.[51]  However, the threshold determination that must be made is whether the material is even a solid waste,[52] which is the very determination at issue in this case.  Howmet recognizes, and has never disputed, that it has the responsibility to determine whether its used KOH is a spent material – that is, whether the KOH, without being processed, could continue to serve the

---

[47]    *See* Region 2 Joint Stipulations, *supra* note 2, ¶¶ 4, 11-13, 18, 19; Region 6 Stipulation of Facts, *supra* note 2, ¶¶ 4, 10-12, 17, 18; *see also* Region 2 Mem., *supra* note 8, at 12 (discussing Royster's use of the used KOH).

[48]    40 C.F.R. § 261.1(c)(1) .

[49]    *See id.* § 22.24(a).

[50]    *See* EAB Final Decision, *supra* note 2, at 12.

[51]    *See* 40 C.F.R. § 262.11.

[52]    *See* 45 Fed. Reg. at 33,090 ("Because no material can be a 'hazardous waste' without first being a 'solid waste' . . ., what constitutes a 'solid waste' is really the definitional starting point for the hazardous waste management system.").

purpose for which the KOH was produced.  Howmet made that determination under the undisputed facts of this case and correctly concluded that its used KOH was not spent – and hence was not a solid waste, and therefore not a hazardous waste – because the used KOH in Royster's manufacturing operations could continue to serve the purpose for which the unused KOH was produced without processing.

Although the burden was on EPA – *not* Howmet – in the proceedings below to prove that the KOH at issue could "no longer serve the purpose for which it was produced without processing,"[53] it is beyond dispute that KOH is manufactured for many uses, including use as a cleaner (i.e., Howmet's use) and as a source of potassium and neutralizing agent in the manufacture of fertilizer (i.e., Royster's use).[54]  KOH is a material with a single, elemental purpose and multiple uses.  The purpose of KOH is to provide a high concentration of hydroxide ions and a concentrated source of potassium, which in turn results in KOH being effective in various different applications and for various different uses.

EPA attempts to avoid the fact that both Howmet and Royster were using the KOH in question for the purpose for which the material was produced.  Indeed, EPA has certainly avoided its burden of proving that, in Royster's operations, the KOH was *not* serving the purpose for which the KOH was produced – the record is devoid of any evidence on this issue.  Although EPA carries the burden to prove otherwise, it cannot be reasonably disputed that, while the KOH could no longer serve Howmet's needs, Royster continued to use it, without processing, for the purpose for which it was produced – as a source of potassium and a neutralizing agent.[55]

---

[53]      *See* 40 C.F.R. §§ 22.24(a), 261.1(c)(1).

[54]      *See* ALJ's Order on Mots., *supra* note 11, at 6 n.12.

[55]      *See* Region 2 Mem., *supra* note 8, at 12 (discussing Royster's use of used KOH); Region 2 Joint Stipulations, *supra* note 2, ¶¶ 18, 19; Region 6 Stipulation of Facts, *supra* note 2, ¶¶ 17, 18.  KOH's alkaline value – it's high pH – is directly attributable to the presence of the high concentration of

14

Accordingly, the KOH, as reused by Royster, does not constitute a "spent material" as that term is defined by the plain meaning of EPA's regulations.

    **B.**    **THE EAB GAVE INSUFFICIENT CONSIDERATION TO THE PLAIN LANGUAGE OF THE REGULATION AND IMPROPERLY CONSIDERED MATTERS OUTSIDE OF THE REGULATION BEFORE CONSIDERING THE REGULATORY TEXT ITSELF**

As the EAB acknowledged in the administrative proceedings below, "'[t]he plain meaning of words is ordinarily the guide to the definition of a regulatory term.'"[56] The EAB also recognized that the proper approach to determining whether the Agency lawfully applied the regulation at issue is to "start *first* with the regulatory text to see if its meaning is clear on its face in terms of its application."[57] Because, as discussed above, a court may not defer to an agency's interpretation of an unambiguous regulation,[58] an analysis of the Agency's interpretation must

---

hydroxide ions in KOH. In its fertilizer manufacturing operations, Royster was using the high concentration of hydroxide ions in the used KOH to neutralize or otherwise lower the pH of its mixture.

[56]    EAB Final Decision, *supra* note 2, at 13, 28 (quoting *In re Bil-Dry Corp.*, 9 E.A.D. 575, 595 (EAB 2001); *T.S. v. Bd. of Educ.*, 10 F.3d 87, 89 (2d Cir. 1993)); *see also In re Sealed Case*, 237 F.3d at 667 (holding that, if the regulation at issue is unambiguous, the regulation's plain meaning controls the court's decision); *cf. United Scenic Artists, Local 829, Bhd. of Painters & Allied Trades, AFL-CIO v. NLRB*, 762 F.2d 1027, 1032 n.15 (D.C. Cir. 1985) ("It is an elementary principle of statutory construction that ordinarily the plain meaning of statutory language controls . . . .").

[57]    EAB Final Decision, *supra* note 2, at 28 (emphasis added); *see also id.* at 29 ("The parties agree that the regulatory text is the appropriate place to *begin* the analysis . . . .") (emphasis added); *cf. id.* at 5 ("[A]ny analysis of whether a substance is a hazardous waste *must begin* with an analysis of whether it is solid waste.") (emphasis added); 45 Fed. Reg. at 33,090 ("Because no material can be a 'hazardous waste' without first being a 'solid waste' . . ., what constitutes a 'solid waste' is really the definitional starting point for the hazardous waste management system."); *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text . . . ."); *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1234 (D.C. Cir. 2003) ("We begin our analysis, as always, with the text of the statute."); *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1304 (D.C. Cir. 1981) ("We turn first, as we must, to the language of the statute, 'the most important manifestation of Congressional intent.'") (quoting *Lawrence v. Staats*, 640 F.2d 427, 436 (D.C. Cir. 1981) (MacKinnon, J., concurring)); *Am. Trucking Ass'ns, Inc. v. United States*, 602 F.2d 444, 449-50 (D.C. Cir. 1979) (citing "the well settled principle that in construing statutory language [courts] look first to the wording of the statute").

[58]    *Christensen*, 529 U.S. at 588; *see also In re Sealed Case*, 237 F.3d at 667; *Dialysis Clinic, Inc.*, 518 F. Supp. 2d at 202; *Sierra Club v. Mainella*, 2005 WL 3276264, at *10 & n.10; *Sierra Club v. Leavitt*, 355 F. Supp. 2d at 548, 552.

first begin with the plain language of the regulation at issue.[59]  If "an 'alternative reading is compelled by the regulation's plain language,'" that is the end of the inquiry.[60]

Although the EAB recited these fundamental principles of regulatory construction, the Board did not adhere to them with any diligence or sincerity.  Indeed, the EAB did not even attempt to address the plain language of the single-sentence "spent material" definition until some 29 pages into its decision.[61]  Rather than turning first to the regulatory language at issue, the EAB began with a lengthy review of the legislative, judicial, and regulatory history of "secondary materials" under RCRA, including the use of such materials as ingredients in fertilizer, and then proceeded to review the regulatory history of the "spent material" definition.[62] For the reasons set forth below, the EAB's approach was fundamentally misguided.[63]

---

[59]      *Cf. Lamie*, 540 U.S. at 534 ("It is well established that 'when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.'  So we begin with the present statute.") (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)) (internal citations omitted).

[60]      *Thomas Jefferson Univ.*, 512 U.S. at 512 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)); *see also Fina Oil & Chem. Co.*, 332 F.3d at 679; *Dialysis Clinic, Inc.*, 518 F. Supp. 2d at 202; *Sierra Club v. Mainella*, 2005 WL 3276264, at *10 n.10; *cf. Lamie*, 540 U.S. at 534; *Zerilli v. Evening News Ass'n*, 628 F.2d 217, 220 (D.C. Cir. 1980) ("The starting point in construing any statute is the language of the statute itself, . . . and if that language is clear, the judicial inquiry ends, for a court must give effect to a statute's unambiguous meaning.") (internal citation omitted).

[61]      *See* EAB Final Decision, *supra* note 2, at 29 (addressing, for the first time, the question of whether the "spent material" definition is clear on its face in its application to Howmet's used KOH).

[62]      *See id.* at 2, 15-28.

[63]      *Cf. Lamie*, 540 U.S. at 536  ("We should prefer the plain meaning since that approach respects the words of Congress. In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history."); *id.* at 542 ("[W]e must determine intent from the statute before us."); *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) ("[R]esort to legislative history is not appropriate in construing plain statutory language."); *Petry v. Block*, 697 F.2d 1169, 1171 (D.C. Cir. 1983) ("Where the language of the statute is clear and unambiguous, the starting point for interpreting the statute is the language itself and there is neither need nor warrant to look elsewhere.").

1.      **The EAB's Analysis Was Flawed And Biased By Its Premature And Incorrect Treatment Of Howmet's Used KOH As A Secondary Material**

At the outset of its review of the RCRA-related history of secondary materials, the EAB recognized that the term "secondary materials" is not defined by law or regulation, but is used by EPA to refer to certain materials – *including* spent materials – "that potentially can be a solid and hazardous waste when recycled."[64]   Accordingly, spent materials are a subset of secondary materials, as that term is used and understood by EPA.[65]   The EAB's lengthy review of secondary materials was fundamentally flawed because the Board proceeded in its review under the mistaken premise that Howmet's used KOH was, *de facto*, a secondary material.[66]   However, Howmet's used KOH can only be considered among the class of secondary materials *if it is first determined to be a spent material*.  Whether Howmet's used KOH can properly be regarded as a spent material is the threshold question at issue in this case, and was the threshold question at issue before the EAB.  In its analysis, the EAB effectively presumed the answer to this question before the Board ever addressed the merits of the issue.  This circular, outcome-driven approach cannot stand.

In its decision, well prior to reaching the actual language of the "spent material" definition, the EAB opined that "Howmet's arguments regarding the regulatory treatment of its *secondary* KOH ignore altogether the fact that the regulatory history of the RCRA regulations reflects a fairly clear intention on EPA's part to regulate the deployment of *hazardous secondary*

---

[64]      50 Fed. Reg. 614, 616 n.4 (Jan. 4, 1985); *see also* EAB Final Decision, *supra* note 2, at 5-6 & n.10 ("A 'spent material' is one such secondary material when it is recycled.").

[65]      *See* 50 Fed. Reg. at 616 n.4 (listing the types of secondary materials); *see also* EAB Final Decision, *supra* note 2, at 5-6 & n.10, 27 (referring to "spent materials" as "one of the regulated secondary materials").

[66]      *See, e.g.*, EAB Final Decision, *supra* note 2, at 19 (referring to Howmet's "*secondary* KOH" at the outset of the Board's review of the regulatory history of secondary materials, and before turning to an "analysis of why Howmet's KOH is a spent material under RCRA") (emphasis added).

*materials* as ingredients in fertilizer."[67]  The Board then proceeded with a lengthy and detailed discussion of this regulatory history – i.e., how EPA has historically "viewed the use of *hazardous secondary materials* in the manufacture of fertilizer" – before it addressed the question of whether Howmet's used KOH can even be considered a secondary material per the plain language of the "spent material" definition.[68]  The EAB concluded its review of the secondary materials history with the Board's determination that Howmet's plain reading of the "spent material" definition "essentially produces an unconditional, no-controls exemption for *hazardous KOH secondary materials* destined for reuse in fertilizer manufacture."[69]  Here again, the EAB reached this determination – a determination that presumes Howmet's used KOH is a spent material – before the Board ever addressed the plain language of the regulatory definition at issue.[70]

Howmet's arguments appropriately do not address EPA's historic consideration and regulation of secondary materials because Howmet does not dispute that *if* its used KOH is a spent material, *then* it is also a secondary material, as that term is used by EPA, and a solid and hazardous waste subject to regulation under RCRA.  Howmet is not contesting those EPA regulations regarding the reuse of secondary materials that the EAB analyzed in detail, but those regulations are applicable *only if Howmet's used KOH is first determined to be a spent material*

---

[67]    *Id.* (emphasis added).

[68]    *Id.* at 22 (emphasis added); *see also id.* at 19 ("We now review this regulatory history, before turning . . . to our analysis of why Howmet's KOH is a spent material under RCRA.").

[69]    *Id.* at 24 (emphasis added).

[70]    Following the EAB's brief consideration of the plain language of the "spent material" definition, as discussed below, the Board returned to its earlier presumption that Howmet's used KOH is a secondary material: "[T]he various references to the Agency's intention to regulate as waste secondary materials used as ingredients in fertilizers applied to the land provide further evidence of the Agency's intention to regulate the very scenario for which Howmet now seeks sanctuary."  *Id.* at 34.

*and, thereby, a secondary material*. Howmet maintains that its used KOH is not a secondary material, because it is not a spent material.

Under the undisputed facts of this case, the determination of whether Howmet's used KOH is subject to regulation under RCRA starts and ends with a determination of whether the used KOH is a spent material. The EAB bypassed this threshold and final determination, and proceeded to analyze EPA's regulation of spent materials and other secondary materials under RCRA. The EAB's analysis put the cart before the horse. The Board reviewed the various prohibitions on the reuse of secondary materials before even considering the threshold question of whether those prohibitions could properly be applied to Howmet's used KOH (i.e., whether the used KOH could properly be regulated as a secondary material). In essence, the deductive reasoning of this results-driven, bootstrap approach can be summarized as follows: (1) spent materials are among the secondary materials subject to regulation under RCRA; (2) EPA regulates under RCRA the use of secondary materials as ingredients in fertilizer; (3) Howmet's used KOH was used as a fertilizer ingredient; therefore, (4) Howmet's used KOH is a spent material subject to regulation under RCRA. Neither the incongruous approach, nor the resulting holding, can be sustained.

By the time the EAB concluded its review of the RCRA-related history of secondary materials, the Board had so slanted its legal analysis that its ultimate finding was a foregone conclusion. Finally signaling a turn toward the one-sentence regulatory definition at issue, the EAB framed the threshold question not in terms of whether Howmet's used KOH is a spent material under the plain language of the definition, but rather as follows: Whether the "spent material" definition "can be credibly read as undoing" EPA's intent "to treat the reuse of

*hazardous secondary materials* as fertilizer ingredients as regulated hazardous waste activity."[71]

This was the skewed lens through which the EAB reviewed the plain language of the "spent material" definition. What was, and should have remained, a discrete regulatory question, to be governed by the plain language of the applicable regulation, was framed by the EAB as a wholesale attack on EPA's regulation of secondary materials, *before the EAB even passed judgment on the wording of the single-sentence regulation at issue.*

> 2.    **The EAB Erred By Relying On The Regulatory History Of The "Spent Material" Definition Before The Board Even Considered The Plain Language Of The Regulation Itself**

On its long road to consideration of the plain language of the applicable regulation, the Board took yet another detour and reviewed the regulatory history leading up to EPA's final promulgation of the "spent material" definition.[72] Thus, continuing its improper approach to regulatory construction, the EAB looked to interpretive aids without first determining whether there was any ambiguity in the language of the regulation that warranted interpretation.[73] Although the EAB had yet to consider whether the "spent material" definition was clear on its face, the Board set about interpreting the regulatory language, not in accordance with its plain meaning, but rather in accordance with what the Board surmised to be EPA's intent when it

---

[71]     *Id.* at 24. Prior to framing the issue in this manner, the EAB made multiple references in its decision to EPA's intent to regulate, and regulation of, hazardous secondary materials when used as ingredients in land-applied fertilizers. *See, e.g.*, *id.* at 19 (referring to a "fairly clear intention on EPA's part to regulate the deployment of hazardous secondary materials as ingredients in fertilizer as [a] hazardous waste management activity"); *id.* at 20 ("Plainly, the Agency saw fertilizer manufacture using secondary materials as a classic example of 'use constituting disposal.'"); *id.* at 22 (referring to "the Agency's longstanding intentions with respect to the use of hazardous secondary material in the manufacture of fertilizer"); *id.* at 23 n.35 ("[W]e believe that the Agency has long assumed that hazardous secondary materials reused as fertilizer ingredients were hazardous 'wastes.'"); *id.* at 24 ("[I]t seems clear that EPA intended to treat the reuse of hazardous secondary materials as fertilizer ingredients as regulated hazardous waste activity.").

[72]     *See id.* at 25-28.

[73]     *See* sources cited *supra* note 63; *see also Sierra Club v. Mainella*, 2005 WL 3276264, at *13 ("Interpretations inherently involve ambiguous regulations . . . .").

promulgated the regulation.[74]  The EAB's approach was impermissible in light of the "spent material" definition's unambiguous language.  Where the plain meaning of the regulatory language is clear, as it is here, the meaning of the regulation cannot be controlled by language in the regulation's preamble or other regulatory history.[75]

### 3.    The EAB Failed To Give Due Consideration To The Plain Language Of "The Spent" Material Definition

When the EAB finally took up the words of the single sentence that comprises the "spent material" definition, the Board summarily rejected a plain reading of the regulatory terms.  Whereas the Board's premature and improper review of regulatory histories comprised the first half or more of its decision, the EAB's consideration of the plain language of the "spent material" definition was confined to a single paragraph.  Finding that EPA's regulations do not define "purpose" or "use," as those terms are used in the "spent material" definition, the EAB turned to "the everyday meanings of these terms" – to the dictionary definitions of these terms.[76]

---

[74]    *See, e.g.*, EAB Final Decision, *supra* note 2, at 25 ("[W]e do not believe that the Agency . . . intended to shift focus altogether away from the first deployment or application of a material.  After reviewing the rulemaking preambles and interpretive statements by the Agency, we rather believe that the initial deployment or application holds continued significance as a reference point in determining a product's purpose and the waste status of a used material."); *id.* at 26 ("In terms of what the Agency intended . . ., it appears that the use of singular 'purpose' was not accidental.  Rather, the framers of the proposed rule appear to have had a particular purpose in mind . . . .").

[75]    *Cf. Ass'n of Am. R.Rs. v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1997) ("Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by the language in the preamble."); *see also Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) (noting that the "language in the preamble of a regulation is not controlling over the language of the regulation itself," and holding that "[t]he principles governing interpretation of the preamble of a regulation are no different" than those that apply "in the analogous context of statutory construction" considered by the court in *Association of American Railroads*); *Pfizer Inc.*, 735 F.2d at 1509 (holding that an administrative interpretation issued when the final regulation was published "cannot control the plain meaning of the . . . regulation"); *see also Thomas Jefferson Univ.*, 512 U.S. at 525 (Thomas, J., dissenting) ("[I]t is the text [of the regulation], of course, that must be given controlling effect.") (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

[76]    EAB Decision, *supra* note 2, at 30; *cf. Auer v. Robbins*, 519 U.S. 452, 461 (1997) (consulting dictionary to determine if agency's interpretation of regulatory term was reasonable); *Cape Hatteras Access Pres. Alliance v. United States Dep't of the Interior*, 344 F. Supp. 2d 108, 126 (D.D.C. 2004) (relying upon dictionary definition to define the scope of an ambiguous regulatory term); *Am. Fed'n of*

Although the dictionary yielded the commonly understood definitions of "purpose" and "use" ("the object . . . for which something exists" and "to put into service or apply for a purpose," respectively), the Board dismissed these definitions without any substantive discussion, stating only that "the everyday meaning of these terms strike us as ultimately unhelpful in interpreting the spent materials definition."[77]

While these dictionary definitions may not have aided the EAB in interpreting the "spent material" definition to square with the interpretation advanced by the Regions, the definitions do support Howmet's plain reading of the regulation.  Revising the regulatory text to incorporate these definitions fairly yields the following definition of "spent material": Any material that has been *put into service or applied for a purpose* and . . . can no longer serve the *objective* for which it was produced without processing.  Revising the "spent material" definition in this manner to incorporate the "everyday meaning" of the regulatory terms at issue further demonstrates that the relevant question under the regulation is not whether Howmet and Royster utilized KOH for different applications – the relevant question is whether the KOH, as used by Royster, continued to serve the "objective" for which the KOH was produced.[78]  Although EPA wholly failed to address this question in the enforcement proceedings below, and therefore failed to meet its burden of proof, as set forth above, it cannot reasonably be disputed that the KOH used by Howmet and Royster served the objective for which it was produced as employed in each company's respective manufacturing applications.

---

*Gov't Employees, AFL-CIO v. Glickman*, 215 F.3d 7, 10 (D.C. Cir. 2000) ("[T]he lack of a statutory definition does not render a term ambiguous.  It simply leads us to give the term its ordinary, common meaning.") (internal citation omitted); *Am. Trucking Ass'ns, Inc.*, 602 F.2d at 450 (holding that statutory "wording should be given its plain, obvious and rational meaning").

[77]     EAB Final Decision, *supra* note 2, at 30.

[78]     *Id.*

### C.    PUBLISHED EPA STATEMENTS AND ADMINISTRATIVE MATERIALS SUPPORT HOWMET'S READING OF THE PLAIN LANGUAGE THE "SPENT MATERIAL" DEFINITION

As set forth above, interpretation of a regulation begins with its plain meaning. In this case, it ends there as well. The regulation defining a "spent material" is unambiguous; there is no need to look beyond the face of the regulation as there is no ambiguity to resolve. EPA should not be allowed to transform by "interpretation" a regulation that is straightforward on its face and requires nothing more than a plain reading. It is the "text of the regulation . . . which must be given controlling effect."[79] Accordingly, there was no cause for the EAB to delve further into the regulatory history of the regulation and EPA's prior interpretations – the plain language of the regulation controls.

### 1.    EPA's Statements In The Preamble To The Spent Materials Regulation Support A Finding That Howmet's Used KOH Is Not A Spent Material

Nevertheless, although there is no cause to move beyond the text of the regulation defining "spent material," the EAB's misplaced reliance on the preamble to the regulation must be addressed. The proper analysis begins with the recognition that, in 1983, EPA proposed to define "spent material" as "any material that has been used and has served its *original purpose*."[80] In 1985, EPA finalized the definition of "spent material" to read as now provided in 40 C.F.R. § 261.1(c)(1) – "any material that has been used and as a result of contamination can no longer serve the *purpose for which it was produced*."[81] Thus, EPA's 1985 final rule differed

---

[79]    *Thomas Jefferson Univ.*, 512 U.S. at 526 (Thomas, J., dissenting) (citing *Bowles*, 325 U.S. at 414); *see also In re Sealed Case*, 237 F.3d at 667 (holding that, if the regulation at issue is unambiguous, the regulation's plain meaning controls the court's decision); *cf. United Scenic Artists, Local 829, Bhd. of Painters & Allied Trades, AFL-CIO v. NLRB*, 762 F.2d 1027, 1032 n.15 (D.C. Cir. 1985) ("It is an elementary principle of statutory construction that ordinarily the plain meaning of statutory language controls . . . .").

[80]    48 Fed. Reg. 14,472, 14,508 (April 4, 1983) (emphasis added).

[81]    50 Fed. Reg. at 663 (emphasis added).

from its 1983 proposal in that the final rule looked retrospectively to the material's production and clarified that the relevant "purpose" is not the initial (i.e., "original") purpose for which the material is employed, but rather "the purpose for which it was produced."

In the preamble to the 1985 final rule, EPA explained its reasoning for revising the wording of the proposed definition as follows:

> We are continuing to define spent materials as those which have been used and are *no longer fit for use* without being regenerated, reclaimed, or otherwise re-processed. . . . The Agency's reference to original purpose was ambiguous when applied to situations where a material can be further used without being reclaimed, but the further use *is not identical to the initial use.*[82]

EPA's clarification makes clear that the definition of "spent material" in 40 C.F.R. § 261.1(c)(1) was intentionally worded to allow for the exact scenario at issue here – further use of a material that is not identical to the initial use of the material, but which is a use that the material was produced to serve.

In this case, EPA's construction of the term "spent material" improperly requires reuse of the material for the same or similar original *use*.[83]   That construction does not square with the express regulatory definition of "spent material," or with EPA's clarification of that definition in the preamble to its 1985 rulemaking – that a material may be reused for the purpose that the material was *produced* to serve and is still fit to serve.  Nowhere in the regulation or in the preamble to the regulation does EPA state that the initial use and subsequent use or uses of the material must be the same or similar.  Indeed, EPA's statements in the preamble make clear that if the used material is still "fit for use" – *any* use for which it was produced – the material is not spent.[84]

---

[82]    *Id.* at 624 (emphasis added).

[83]    *See* EAB Final Decision, *supra* note 2, at 2, 25, 26, 28, 32, 36 n.53, 39.

[84]    50 Fed. Reg. at 624.

In an effort to support its same or similar "continued use" construction of the spent materials regulation, EPA cites an example that the Agency provided in the rule's preamble: a circuit board solvent being reused for metal degreasing.[85]  EPA makes no claim that this single example is illustrative of all the scenarios under which a material can be reused without being deemed spent.[86]  Moreover, the example neither supports EPA's interpretation nor refutes the plain meaning of the regulation that a material may be reused for the purpose for which it was produced, even if the subsequent reuse is not identical to the initial use.  If the solvent at issue was produced solely for use as a solvent, then Howmet readily agrees that the solvent must continue to be used as a solvent to avoid regulation as a spent material.  In this scenario, where the material was produced for only one specific use, EPA's flawed construction of the "spent material" definition still produces the proper result – the initial and subsequent use of the material must be the same or similar because the material was produced for no other purpose.[87]

This single-use product scenario, however, is not the situation presented in this case.  This case concerns the subsequent use of a material that, as noted above, was produced for a single purpose but multiple uses.  As applied to this situation, EPA's strained interpretation of its regulation produces an erroneous result that is directly at odds with the plain language of the regulation itself.  In the multiple-use product scenario, such as this one, the interpretation put forth by EPA would prohibit reuse of the material for any use other than the initial use that was made of the product, regardless of whether the material is still fit to serve the purpose for which

---

[85]    See id.; EAB Final Decision, *supra* note 2, at 27-28, 36 n.53.

[86]    Regarding this example, in his Order on Motions, the ALJ in the initial proceeding opined that the example is not "indicative that a facility could only reuse the material as a solvent."  ALJ's Order on Mots., *supra* note 11, at 15 n.26.

[87]    The foregoing reasoning and analysis apply equally to the 1998 letter to Safety-Kleen that EPA relied upon in the proceedings below.  *See* Region 2 Mem., *supra* note 8, Declaration of Ton Moy, Ex. 3, Letter from David Bussard, Waste Identification Division, Office of Solid Waste, EPA, to Catherine A. McCord, Manager, Environment and Business Integration, Safety-Kleen (Aug. 1998).

it was produced when employed in other applications and for other uses.[88]   This is an unacceptable interpretation of a regulation that, on its face, expressly allows reuse of a material for any use, so long as the material is still serving "the purpose for which it was produced."[89]

Furthermore, turning back to the 1985 preamble, the parenthetical sentence immediately proceeding the solvent example clarifies that the "continued use" theory is considerably broader than the interpretation put forth by EPA.  The sentence in question explains that the "continued use" theory "is analogous to using/reusing a secondary material as an effective substitute for commercial products."[90]   The regulatory concept of using or reusing secondary materials as effective substitutes for commercial products (as promulgated in EPA's RCRA regulations at 40 C.F.R. § 261.2(e)(1)(ii)) does not in any way restrict the subsequent use to only those uses that are identical or similar to the initial use.

> **2.    The Regulations Preceding The Spent Materials Regulation Provide No Support For EPA's Construction of The "Spent Material" Definition**

In its premature and ultimately improper foray into regulatory histories, the EAB did not confine itself solely to the regulatory history of the "spent material" definition.  Rather, in an effort to bolster the Agency's interpretation of the regulation at issue, the Board went back in time to regulations that were promulgated five years before the spent materials regulation was

---

[88]     To appreciate the difference between the single-use and multi-use product scenario, it is instructive to compare an unformulated product, such as KOH, to a manufactured product, such as a formulated cleaner.  Whereas a formulated cleaner is a mixture of various ingredients, the opposite is true of unformulated products, which are often ingredients in various formulations.  Whereas a formulated product is typically formulated for a single purpose (*e.g.*, cleansing), an unformulated product, acting as an ingredient, may have a number of uses, but the fundamental purpose of the product in each use remains the same.

[89]     40 C.F.R. § 261.1(c)(1).

[90]     50 Fed. Reg. at 624.

finalized, and that were superseded, in part, by the "spent material" definition.[91]  Clearly, these prior regulations provide no evidence of the Agency's intent at the time EPA promulgated the "spent material" definition.[92]  In any event, they provide no support for EPA's reliance on the initial use of a material to define the "the purpose for which [the material] was produced."

In its decision, the EAB explains that the 1980 predecessor rules to the spent materials regulation did not include any reference to "spent materials" or the "purpose for which" a material was "produced."[93]  The EAB maintains that, under the prior regulations, "[a] key reference point in determining whether a material had become a waste was the material's 'original intended use.'"[94]  As the EAB explains this former regulatory scheme, "[o]nce a material had been used and was no longer suited for its originally intended use, it was considered a waste."[95]  The EAB concludes that this "concept of original intended use necessarily focused attention on how the material was deployed after being purchased as a product," and that this focus on "the first deployment or application of a material" was simply carried forward by EPA into the 1985 "spent material" definition.[96]  In short, the EAB maintains that EPA's focus on a material's "original intended use" in 1980 supports the EAB's conclusion that, in 1985, EPA intended to define "the purpose for which [a material] was produced" by reference to the first use that was made of the material following its production.[97]

---

[91]    *See* EAB Final Decision, *supra* note 2, at 25.

[92]    *Cf. Lamie*, 540 U.S. at 534 ("The starting point in discerning congressional intent is the existing statutory text, . . . and not the predecessor statutes.") (internal citation omitted).

[93]    *See* EAB Final Decision, *supra* note 2, at 25.

[94]    *Id.* (citing 40 C.F.R. § 261.2(b)(2) and 45 Fed. Reg. at 33,093).

[95]    *Id.*

[96]    *Id.*

[97]    *See id.*

Even assuming that EPA intended to carry forward, in some respect, the Agency's prior focus on a material's "original intended use," such focus in no way supports the interpretation of the 1985 "spent material" definition that EPA puts forward in this case. By its plain terms, "original intended use" requires a determination of how the material was originally *intended* to be use, not how it was actually deployed in its first use. Indeed, in the preamble to the 1980 regulations, EPA referred to the test as one that looks at whether the "materials . . . have served their original intended purpose."[98]

The focus on "original intent" necessarily looks back to when the material was produced, not to some point following the material's first use. If the Agency intended the actual first use of the material to be determinative of how the material could be reused following that first use, then there would have been no reason for the Agency to focus on the material's original *intended* use or purpose. How the material was *intended* to be used, or its *intended* purpose, would be irrelevant if the material's *actual* use was determinative of its subsequent reuse.

Contrary to the EAB's position, the Agency's prior concept of "original intended use" did not focus attention on how the material was *actually* first used. Rather, as evidenced by the plain language of the regulatory terms and EPA's contemporaneous statements in the preamble to the 1980 rules, the focus was on how the material was originally *intended* to be used – its intended purpose – regardless of its first use. If these 1980 rules have any relevance to the case at hand, they provide further support for a plain reading of the "spent material" definition. The Agency's focus, it appears, has at all times been upon the material's production and the purpose that the material was produced to serve, not the first use that was made of the material.

---

[98]    45 Fed. Reg. at 33,093.

3.     **EPA's Prior Construction Of The "Spent Material" Definition Is At Odds With The Interpretation Put Forth By EPA In This Case**

Per the plain language of the "spent material" definition, and EPA's own statements in the preamble to that regulation, the used KOH that Howmet provided to Royster is not a spent material. This outcome is not changed by the EPA guidance letters and administrative materials relied upon by EPA in the proceedings below. As set forth above, it is the text of the regulation that controls, not EPA's erroneous interpretation of that regulation. Past repetition of a mistaken interpretation cannot overcome the fundamental defect in the position that EPA has taken in this matter.[99]

Furthermore, certain of these materials actually demonstrate that, almost since the day the "spent material" definition was promulgated in 1985, EPA has been applying the regulation in line with the plain-language construction put forth by Howmet. Take, for example, the two 1986 letters discussed in the Regions' filings in the proceeding below (collectively, the "*1986 letters*").[100] One of the letters was written by Steven Silverman, an EPA attorney, (the "*Silverman letter*"); the other letter was written by Matthew Straus, then Chief of EPA's Waste Characterization Branch. Both letters expressly contradict EPA's position in this case and support Howmet's reading of the plain language of the "spent material" definition.

The letters advise that used phosphoric acid from aluminum metal finishing operations may be reused as an ingredient in fertilizer manufacture. The letters note that, in addition to

---

[99]     Moreover, to the extent that EPA can be said to have applied the EAB's interpretation in any of these materials – which is not apparent from the face of the materials – Howmet respectfully submits that such application was in error. In any event, these materials are not binding on this Court and cannot compel application of a regulatory interpretation that is contrary to law.

[100]     Letter from Steven E. Silverman, Attorney, Solid Waste and Emergency Response Division, EPA, to Daniel McCaskill, Vice President, Distribution Systems and Environmental Affairs, Van Watels and Rogers Division (June 4, 1986); Letter from Matthew A. Straus, Chief, Waste Characterization Branch, EPA, to A. L. Horner, Environmental Specialist, Albright and Wilson, Inc. (Oct. 20, 1986). In the proceedings before the ALJ below, the letters were attached to EPA's Initial Reply Brief. *See supra* note 28.

metal finishing applications, phosphoric acid, like KOH, is also used in fertilizer production. Thus, phosphoric acid, like KOH, is a multi-use product. The Silverman letter also notes that the used phosphoric acid will not be reclaimed before being reused in the fertilizer manufacturing process. Thus, the fertilizer manufacturer receiving the used phosphoric acid will employ the used acid in its operations just as Royster employed Howmet's used KOH in its operations – as-is, without any reclamation or processing.[101]

It is readily apparent that EPA's analysis in the 1986 letters is a stepwise application of the "spent material" definition identical to the one put forth by Howmet in this case. EPA analyzed the proposed subsequent use of the used material; determined that the subsequent use was for the purpose for which the unused material was produced to serve; determined that the used material was still fit for that purpose; and determined that the used material could be reused for that purpose without processing. Step by step, the analysis mirrors Howmet's interpretation of the "spent material" definition and reaches the same result. In both letters, EPA concludes that a multi-use product, which has been used in industrial applications until it is no longer effective for that use, may be reused as an ingredient in fertilizer manufacturing without invoking EPA's RCRA jurisdiction. Moreover, the material at issue in the 1986 letters, an acid, would exhibit the same hazardous characteristic as Howmet's used KOH – both would be characteristically corrosive.

There is no support for EPA's disparate treatment of Howmet's used KOH and the used phosphoric acid at issue in the 1986 letters. There is no support for EPA's position that Howmet's used KOH is a hazardous waste when EPA concluded nearly two decades ago that used phosphoric acid "would not be considered a solid or hazardous waste under RCRA when

---

[101]    *See* Region 2 Mem., *supra* note 8, at 12 (discussing Royster's use of the used KOH); Region 2 Joint Stipulations, *supra* note 2, ¶¶ 18, 19; Region 6 Stipulation of Facts, *supra* note 2, ¶¶ 17, 18.

used in the same manner as virgin phosphoric acid." Howmet's used KOH, when employed as a source of potassium and neutralizing agent in Royster's fertilizer manufacturing operations, is used in the same manner as virgin KOH and no differently than the used phosphoric acid at issue in the 1986 letters.

Nevertheless, EPA attempts to distinguish the used phosphoric acid on the basis that it was represented to the Agency to be as pure as virgin phosphoric acid, as noted the 1986 letters.[102] Even assuming the two used materials can be so distinguished, it is a distinction without a difference. Under the facts as recounted in the 1986 letters, there is only one legal mechanism for excluding the used phosphoric acid from EPA's RCRA jurisdiction – application of the spent materials regulation. If the conclusions reached by the Agency in the 1986 letters are to have any legal merit, EPA had to apply the spent materials regulation and find that the used acid was not a spent material, and therefore was not discarded, because it could continue to be used as phosphoric acid, "the purpose for which it was produced," without processing.[103]

It is not the virgin or used nature of the material that triggers EPA's RCRA jurisdiction; whether virgin or used, the material must be discarded before EPA can invoke its RCRA jurisdiction.[104] As noted above, a material must (1) first be discarded (2) in order to be considered a solid waste (3) to in turn be regulated under RCRA as a hazardous waste. EPA's RCRA jurisdiction does not extend to materials that have not been discarded and, thus, are not solid wastes capable of being classified as hazardous wastes. However, if a virgin material that

---

[102]    *See* EAB Final Decision, *supra* note 2, at 38 n.56.

[103]    40 C.F.R. § 261.1(c)(1).

[104]    *See, e.g.*, *American Mining Congress v. EPA*, 824 F.2d 1177, 1190 (D.C. Cir. 1987) ("*AMC I*") (finding "clear Congressional intent to extend EPA's authority only to materials that are truly discarded, disposed of, thrown away, or abandoned"); *see also* 42 U.S.C. § 6903(27) (defining "solid waste" as any "discarded material"); 40 C.F.R. § 261.2(a)(1) (same); 53 Fed. Reg. 519, 520 (Jan. 8, 1988) (noting that *AMC I* "limited the Agency's authority over hazardous secondary materials destined for recycling to materials that are 'discarded'").

exhibits a hazardous characteristic, such as phosphoric acid, is discarded, EPA may properly regulate it as a hazardous waste under RCRA.

In this case, as in the 1986 letters, the question of whether a material has been discarded hinges upon application of the spent materials regulation. Nearly twenty years ago, under the same set of facts as presented in this case, EPA concluded that it did not have RCRA jurisdiction over materials that are legally indistinguishable from the material at issue in this case. The facts are the same and the applicable regulation has not change, thus the conclusion should not vary. Just as EPA lacked jurisdiction over the used phosphoric acid at issue in the 1986 letters, the Agency lacks jurisdiction over Howmet's used KOH.

### D.    HOWMET WAS NOT GIVEN FAIR NOTICE OF THE INTERPRETATION PUT FORTH BY EPA IN THIS MATTER

As set forth above, there are no grounds for finding EPA's "spent material" interpretation to be anything other than erroneous and contrary to the plain language of the regulation. However, should this Court conclude otherwise, Howmet submits that it has not been given fair notice of the interpretation advanced by EPA. Constitutional principles of due process dictate that a penalty may not be assessed where the regulated party has not been provided notice of the agency's interpretation of the applicable regulation.[105] The relevant question is "whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations."[106]

---

[105]    *See Trinity Broad. of Fla., Inc. v. FCC,* 211 F.3d 618, 628-32 (D.C. Cir. 2000); *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n,* 212 F.3d 1301, 1303 (D.C. Cir. 2000); *United States v. Chrysler Corp.*, 158 F.3d 1350, 1354-55 (D.C. Cir. 1998); *General Elec. Co. v. EPA,* 53 F.3d 1324, 1328-29 (D.C. Cir. 1995); *United States v. Chrysler Corp.*, 995 F. Supp. 150, 160 (D.D.C. 1998), *rev'd in part on other grounds*, 158 F.3d1350 (D.C. Cir. 1998).

[106]    *General Elec. Co.*, 53 F.3d at 1329; *see also Chrysler Corp.*, 995 F. Supp. at 160 ("In determining the adequacy of the notice, the Court first reviews the language of the standard itself.").

Fair notice is not provided unless the regulated party can identify, with "ascertainable certainty," on the face of the regulations and other public statements issued by the agency, the standard that the agency is applying.[107] If a violation of a regulation will subject the regulated entity to sanctions, the regulation "cannot be construed to mean what an agency intended but did not adequately express."[108] "The test 'is not what [the agency] might possibly have intended, but what [was] said."[109] "An agency cannot ignore its primary obligation to state its directives in plain and comprehensible English. When it does not live up to this obligation, [the court] will not bind a party by what the agency intended, but failed to communicate."[110] To satisfy fair notice standards, the notice must be an "authoritative interpretation of the regulation" from the agency.[111]

As set forth above, neither the plain wording of the "spent material" definition, nor the preamble to that regulation or the administrative materials relied upon by EPA, provides an authoritative interpretation of the regulation that accords with the one put forth by EPA in this

---

[107]    *General Elec. Co.*, 53 F.3d at 1329; *see also Trinity Broad. of Fla., Inc.,* 211 F.3d at 628; *U.S. v. Hoechst Celanese Corp.*, 964 F. Supp. 967, 979, 982 (D.S.C. 1996), *rev'd in part on other grounds* 128 F.3d 216 (4th Cir. 1997) ("The whole point of the 'fair notice' line of cases is that, as a matter of due process, the regulatory obligations to which persons are subject flow from what the regulations themselves say with ascertainable certainty.").

[108]    *L. R. Willson & Sons, Inc. v. Donovan*, 685 F.2d 664, 675 (D.C. Cir. 1982) (quoting *Kent Nowlin Constr. Co. v. OSHRC*, 593 F.2d 368, 371 (10th Cir. 1979)); *Hoechst Celanese Corp.*, 964 F. Supp. at 979 (citing *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986)); *see also id.* at 980 ("Awarding penalties where the problem is the language chosen by the agency, rather than any unwillingness to comply would only 'delay the day when . . . regulations will be written in clear and concise language' so that regulated parties 'will be better able to understand and observe them.'") (quoting *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 650 (5th Cir. 1976)).

[109]    *Hoechst Celanese Corp.*, 964 F. Supp. at 979-80 (quoting *U.S. v. Trident Seafoods Corp.*, 60 F.3d 556, 559 (9th Cir. 1995) (brackets in original)); *cf. Lamie*, 540 U.S. at 542 ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. 'It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.'") (quoting *United States v. Granderson,* 511 U.S. 39, 68 (1994)).

[110]    *McElroy Elecs. Corp. v. F.C.C.*, 990 F.2d 1351, 1353 (D.C. Cir. 1993).

[111]    *Gates & Fox Co.*, 790 F.2d at 157.

matter. Indeed, as noted above, the plain wording of the spent materials regulation, the preamble to the regulation, and EPA's statements in the 1986 letters all support Howmet's plain-language construction of the "spent material" definition.

EPA's interpretation is not ascertainable, with any degree of certainty, from the face of the regulation. Nor is it evident in any public statement issued by EPA. What the Agency said in the "spent material" definition, in the preamble to the regulation, and in the 1986 letters is simply not consistent with the interpretation put forth by EPA in this case.[112]   EPA's interpretation has never been adequately expressed by EPA in any public forum and, therefore, cannot be applied in this case to levy penalties against Howmet.[113]

The procedural facts of this case attest to the difficulty of identifying the standard that EPA was applying with any degree of certainty, ascertainable or otherwise. Indeed, the Agency itself has struggled throughout this case to explain a coherent standard that Howmet and other regulated entities can use to ensure that their activities are compliant with EPA's interpretation.[114]   The Regions and the ALJ below based their reasoning on the "plain meaning"

---

[112]    *Cf. Rollins Envtl. Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 653 (D.C. Cir. 1991) ("No reasonable reader of this provision could have known that EPA's current construction is what the agency originally must have had in mind.").

[113]    *See Hoechst Celanese Corp.*, 964 F. Supp. at 979; *see also U.S. v. Hoechst Celanese Corp.*, 128 F.3d 216, 225 (4th Cir. 1997) (finding that EPA's "regulations, their preamble, or purpose" did not provide fair notice where EPA's interpretation of the regulations was not mandated and "some of the language in the preamble" supported the regulated entity's "narrower interpretation").

The EAB faults Howmet for not inquiring with EPA about the agency's interpretation of the "spent material" definition. *See* EAB Final Decision, *supra* note 2, at 47-48. However, as this Court and the D.C. Circuit have recognized, the agency "bears the burden of adequately informing the regulated of what is necessary for compliance." *United States v. Chrysler Corp.*, 995 F. Supp. at 163 n.2.  "In determining adequate notice, the focus is on what the agency did or did not do, not necessarily on what the regulated could have done to seek further guidance." *Id.*  (citing *General Elec. Co.*, 53 F.3d 1324).

[114]    *See S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1297 (D.C. Cir. 1995) ("Congress and the courts require that agency action reflect clear, rational decisionmaking that gives regulated members of the public adequate notice of their obligations."); *FTC v. Atlantic Richfield Co.*, 567 F.2d 96, 103 (D.C. Cir. 1977) ("[T]here is the need for a clear and definitive interpretation of all agency rules so that the parties upon whom the rules will have an impact will have adequate and proper notice concerning the

of the regulation.  But the EAB later rejected outright a plain reading of the regulation.[115]  The ALJ prohibited any reuse of Howmet's used KOH other than reuse in an "ongoing, continuous process of beneficial reuse by Howmet."  This, too, the EAB rejected.[116]

Perhaps the best evidence of a lack of fair notice is the EAB's final decision itself.  The "spent material" definition at issue is a single, short sentence.  Yet, the EAB needed over 40 pages of discussion to justify the Agency's construction of this regulation.  Moreover, in less than a paragraph, the EAB summarily rejected any claim that the regulation was clear on its face.[117]  Thus, those 40 pages were almost entirely consumed with a discussion of regulatory histories and informal Agency statements that must be consulted in hopes of divining the standard that the Agency has in mind, but has never succinctly expressed.[118]  If this is "the most obvious way" of obtaining notice of EPA's interpretation, then there can be no reasonable claim that Howmet was provided fair notice.[119]  While the "spent material" interpretation put forth by EPA in the context of this case might possibly be what the Agency intended, it is certainly not what the Agency has said.

---

agency's intentions."); *see also Thomas Jefferson Univ.*, 512 U.S. at 525 (Thomas, J., dissenting) ("It is perfectly understandable, of course, for an agency to issue vague regulations, because to do so maximizes agency power and allows the agency greater latitude to make law through adjudication rather than through the more cumbersome rulemaking process.  Nonetheless, agency rules should be clear and definite so that affected parties will have adequate notice concerning the agency's understanding of the law.").

[115]    *See* EAB Final Decision, *supra* note 2, at 30 & n.44, 44.

[116]    *See id.* at 19 n.30.

[117]    *See id.* at 30; *see also id.* at 40 (noting that "the text of the regulation perhaps makes the inquiry before us more challenging than it otherwise needed to be"); *id.* at 44 (noting that "the regulatory definition of 'spent material,' on its face, is not a model of clarity").

[118]    *See McElroy Elecs. Corp.*, 990 F.2d at 1358 ("[W]e look not at the reasonableness of the [agency's] intended interpretation, but at the clarity with which the agency made that intent known.").

[119]    *Cf. Chrysler Corp.*, 158 F.3d at 1357 ("Chrysler may have satisfied [the regulatory requirements] with the exercise of extraordinary intuition or the aid of a psychic, but these possibilities are more than the law requires.").

For the foregoing reasons, the D.C. Circuit's holding against EPA in the *General Electric* case applies equally here: "Where, as here, the regulations and other policy statements are unclear, where the petitioner's interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may not be punished."[120] Accordingly, even if the Court accepts EPA's interpretation of the "spent material" definition, the Agency's action should nevertheless be set aside because Howmet has not been given fair notice of that interpretation and, absent such notice, Howmet has committed no violation of the regulatory requirements.[121]

## IV.
## CONCLUSION

For the foregoing reasons, the final EPA action at issue in this case, as embodied in the final decision of the EAB, is unlawful. Howmet respectfully requests that the final decision of the EAB be set aside and that judgment on all pending claims be entered in Howmet's favor.

Respectfully Submitted,

Dated: July 25, 2008

/s/ *Bryan J. Moore*
Bryan J. Moore/DC Bar No.: 482591
VINSON & ELKINS L.L.P.
The Terrace 7
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Telephone:    512.542.8520
Facsimile:    512.236.3329
Email:        bmoore@velaw.com

COUNSEL FOR PLAINTIFF
HOWMET CORPORATION

---

[120]    *General Elec. Co.*, 53 F.3d at 1333-34.

[121]    *See Hoechst Celanese Corp.*, 964 F. Supp. at 979.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HOWMET CORPORATION

                Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and
STEPHEN L. JOHNSON, Administrator

                Defendants.

Case No. 1:07-cv-01306 (EGS)

**[PROPOSED] ORDER GRANTING PLAINTIFF HOWMET CORPORATION'S
MOTION FOR SUMMARY JUDGMENT**

On July 25, 2008, Plaintiff Howmet Corporation filed its Motion for Summary Judgment in the above-caption matter. Having considered the Motion, the Response, the Reply, the Brief of Amicus Curiae, the administrative record, the applicable law, and argument of counsel, this Court finds that judgment should be entered in favor of Plaintiff. It is, therefore,

ORDERED that the Motion for Summary Judgment filed by Plaintiff Howmet Corporation is in all things GRANTED. The final agency action of the United States Environmental Protection Agency at issue, as set forth in the Final Decision of the Environmental Appeals Board in *In re Howmet Corp.*, RCRA (3008) Appeal No. 05-04 (EAB, May 24, 2007), 13 E.A.D. ___, is hereby held unlawful and set aside.

SO ORDERED.

SIGNED this _____ day of _____, 2009.

_____
Emmet G. Sullivan
United States District Judge

Per Local Rule LCvR7(k), the following attorneys are entitled to be notified of entry of the foregoing Proposed Order:

**FOR PLAINTIFF:**

Bryan J. Moore
VINSON & ELKINS L.L.P.
The Terrace 7
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Telephone:    512.542.8520
Facsimile:    512.236.3329
Email:        bmoore@velaw.com

**FOR DEFENDANTS:**

Angeline Purdy
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, DC 20026-3986
Telephone:    202.514.0996
Facsimile:    202.514.8865
Email:        angeline.purdy@usdoj.gov

**FOR AMICUS CURIAE:**

Donald J. Patterson, Jr.
BEVERIDGE & DIAMOND, P.C.
1350 I Street, NW, Suite 700
Washington, DC 20005-3311
Telephone:    202.789.6032
Facsimile:    202.789.6190
Email:        dpatterson@bdlaw.com