# UNITED STATES DISTRICT COURT

# FOR THE  DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| HOWMET CORPORATION<br><br>            Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY and<br>STEPHEN L. JOHNSON, Administrator<br><br><br>            Defendants. | Case No. 1:07-cv-01306 (EGS)<br><br>*Next Scheduled Court Deadline:*<br>*Defendant's Brief Due 09/25/2008* |

## BRIEF OF AMICUS CURIAE THE ALLIANCE OF AUTOMOBILE MANUFACTURERS IN SUPPORT OF HOWMET CORPORATION'S MOTION FOR SUMMARY JUDGMENT

On July 25, 2008, Plaintiff Howmet Corporation ("Howmet") filed a Motion for

Summary Judgment.  Pursuant to the scheduling order issued by the Court on April 16, 2008, the

Alliance of Automobile Manufacturers ("Alliance") hereby files this brief as amicus curiae in

support of Howmet's Motion for Summary Judgment.

I.    **INTRODUCTION AND STATEMENT OF INTEREST OF AMICUS CURIAE THE ALLIANCE OF AUTOMOBILE MANUFACTURERS**

As set forth in Plaintiff Howmet Corporation's Motion for Summary Judgment ("Howmet Motion"), the factual situation at issue in this appeal involves Howmet's use of potassium hydroxide ("KOH") as a cleaning agent for metal castings.  When Howmet's KOH became too contaminated for continued use as a cleaning agent, Howmet at times would send the KOH to Royster-Clark for further use as a source of potassium in fertilizer and to control the pH of the fertilizer (at other times the Howmet KOH was shipped off-site for disposal as a hazardous waste).

In the administrative action on appeal to this Court, *In re: Howmet Corporation*,[1] the Environmental Appeals Board ("EAB") determined that under the Resource Conservation and Recovery Act ("RCRA") hazardous waste management program,[2] the subsequent use of Howmet's KOH in fertilizer production meant that Howmet's KOH was classified under the relevant RCRA regulations as a "spent material", making the use of Howmet's KOH in fertilizer the disposal of a hazardous waste.  In the Howmet Motion, Howmet contends that, contrary to the EAB's decision, under the plain language of the regulatory term "spent material," as well as

---

[1] Final Decision, *In re:  Howmet Corp.*, Nos. RCRA-06-2003-0912 & RCRA-02-2004-7102, Appeal No. RCRA (3008)  05-04, EAB R. Doc. 17 (May 24, 2007) (hereinafter "EAB Final Decision" or "*Howmet*").  The Alliance notes that the EAB Final Decision states that there were no issues of fact before the EAB, EAB Final Decision at 13, and that the Howmet Motion states that there are no issues of fact in this appeal, Howmet Motion at 2, n. 2.

[2] 42 U.S.C. §§ 6921-6939(e) (2007); 40 C.F.R. Parts 260–272 (2007).

the relevant regulatory history and subsequent EPA actions, Howmet's used KOH is not a spent

material, and not a hazardous waste,[3] when used to produce fertilizer.

To support its decision in *Howmet*, the EAB appears to rely, at least in part, on a

conclusion that the use of Howmet's KOH in fertilizer production falls within the RCRA

regulatory concept of a "use constituting disposal" because it was used to produce a product—

fertilizer—that was applied to the land, making the KOH a hazardous waste for that reason.[4]   In

the portion of the opinion of immediate interest to amicus curiae the Alliance, however, the EAB

appears in tandem to rely on a flawed and confused reading of the key RCRA regulatory term

"spent material," which is defined in RCRA's "definition of solid waste" regulations as "any

material that has been used and as a result of contamination can no longer serve the *purpose for*

*which it was produced* without processing."[5]   In particular, the EAB determined that the term

"purpose for which it is produced" in the RCRA regulatory definition of "spent material" should

be interpreted such that a product that is initially used for one purpose, and then subsequently

used for a different legitimate purpose, is generally a spent material and thus a solid waste

subject to EPA's "hazardous waste" regulations simply because its initial use had been

---

[3] Under the RCRA program, a material must be both a "solid waste" and be "hazardous" either because it displays a hazardous characteristic or is specifically listed as hazardous in order to be classified and regulated as a hazardous waste. *See* 42 U.S.C. § 6903(5) (2007); 40 C.F.R. § 261.3(a) (2007).  The issue in *Howmet* is whether the KOH is a "solid waste;" if it is, the KOH must be managed as a hazardous waste because KOH displays the hazardous characteristic of "corrosivity."  40 C.F.R. § 261.22  (2007).

[4] See *Howmet*, at 19, 20–24.

[5] 40 C.F.R. § 261.1 (c)(1) (2007) (emphasis added).

completed.[6]  Following this analysis, the EAB held that the "purpose" for which Howmet's KOH was produced was its "initial deployment or application"—cleaning metal parts.  Under the EAB's analysis, when that use ended and the KOH could no longer be used for that specific purpose, the KOH was a "spent material" and a hazardous waste.[7]

Amicus curiae Alliance is a not-for-profit automobile manufacturing industry trade association made up of ten car and light truck manufacturers, including BMW Group, Chrysler LLC, Ford Motor Company, General Motors Corporation, Mazda North American Operations, Mercedes-Benz USA, Mitsubishi Motor Sales of America, Inc., Porsche Cars North America, Inc., Toyota Motor North America, Inc. and Volkswagen of America, Inc.  The Alliance's members account for over seventy-two percent of the new cars and trucks sold in the United States each year.

The Alliance's interest in this case stems from its members use of purge solvents in painting operations in automobile and light truck manufacturing.  At a typical Alliance member automobile manufacturing plant, hundreds of vehicles are painted every day, with frequent color changes.  In order to clean paint applicators properly after a color change, Alliance members employ purge solvents, which clean the paint applicators by solubilizing paint resins, suspending paint pigments, reducing paint viscosity, and allowing the dispersion and removal of paint solids. The purge solvents then continue to resolubilize the paint solids and keep the paint solids in suspension in downstream piping and equipment, which carries the purge solvents for eventual

---

[6] *Howmet*, at 32 ("[I]t is the type of application for which it was initially deployed that is *the* purpose of concern in order to determine waste status") (emphasis in original).

[7]*Id.*, at 39.

reclamation. The relevant question under RCRA, one which is closely related to the issue in *Howmet* discussed above, is whether the Alliance purge solvents remain classified as products as they are used in the automobile manufacturing downstream piping and equipment, or whether their "initial deployment or application" ends after the paint applicators, with the result that they are no longer being used "for the purpose they were produced," and could thus be deemed spent materials and hazardous wastes.

On June 20, 2008, the EAB handed down *In Re: General Motors Automotive - North America,* No. RCRA 05-2004-001, Appeal No. RCRA (3008) 06-02 (EAB, 2008).[8] There, the EAB applied its *Howmet* analysis regarding the scope of the regulatory term "spent material" and the EAB's unlawful interpretation of the term "purpose for which it was produced" to GM's use of purge solvents in its automobile manufacturing operations.[9]

---

[8] Hereinafter "GM 2008 EAB Decision."

[9] In the GM 2008 EAB Decision (as stated above GM is an Alliance member), the EAB began its reasoning with an application of the *Howmet* analysis described above, finding:

> Under ordinary circumstances, the initial deployment or application of a batch of material will serve as the touchstone for determining "the purpose for which [that material] was produced," per *Howmet* and at the end of the initial deployment or application, the material will be considered "spent" under 40 C.F.R. § 261.1(c)(1).

*Id.*, at 53 [footnote omitted]. Up through that point, the *Howmet* and GM analyses are for relevant intents and purposes identical. After that point, however, the EAB in GM added an important second element to the analysis, and recognized that a "continued use" policy growing out of EPA's 1985 preamble which adopted the "spent materials" regulatory definition can, if certain limiting conditions are met, create an exception that broadens the term "purpose" in the definition of spent materials. *Id.* at 53-54. This exception is only available, however, if two primary conditions are met, with the latter condition evaluated by means of a three-part test EPA created in a 1998 guidance letter. *Id.* at 124. Ultimately, the EAB remanded the GM case to the Administrative Law Judge ("ALJ") for a consideration of whether the second condition and three factors were met. *Id.* at 125.

(Continued ...)

## II.    SUMMARY OF ARGUMENT

In the wake of the GM 2008 EAB Decision, the Alliance, as amicus curiae, argues the following with respect to the EAB *Howmet* decision:

1. In conformance with the explicit language of the RCRA regulations, general rules of regulatory and statutory construction and relevant case law, the term "purpose for which it was produced" in the RCRA regulatory definition of "spent material" must be interpreted not to refer only to a limited "singular" purpose, but instead to include multiple purposes, with the effect that products are not subject to RCRA jurisdiction as spent materials until they are no longer used for any of the legitimate purposes for which they were produced; and

2. The regulatory history of the RCRA "definition of solid waste" demonstrates— directly contrary to the position espoused by the EAB in *Howmet*—that EPA's replacement in 1985, under the threat of judicial challenge, of the relevant provisions of its definition of solid waste 1980 rule was an explicit rejection of EPA's 1980 approach in that EPA in 1985 adopted a definition of "spent material" which recognized that products can serve multiple purposes, and they do not become "solid wastes" until they are no longer used for any such purpose.

---

(Continued …)

Under the proper reading of the regulatory definition of spent material, as explained below, the term "purpose" should be read broadly to include multiple purposes, meaning that a product does not become a spent material if it is subsequently used for a legitimate purpose, even if that use is different in some sense from how it was used in its "initial deployment." The Alliance files this brief as amicus curiae in *Howmet* because, had the EAB correctly interpreted the term "purpose" in *Howmet*, there would have been no need for the EAB in the GM 2008 Decision to develop an exception consisting of two conditions and a three factor analysis to evaluate the second condition or to remand the GM case to the ALJ to determine if GM's use of purge solvents meets these conditions and factors.

## III.    ARGUMENT

### A.    Under an Elementary Rule of Regulatory and Statutory Construction Which is Explicitly Set Forth in the RCRA Regulations, the Singular Term "Purpose" in the Definition of "Spent Material" Must be Read to Include the Plural "Purposes."

In *Howmet,* the EAB notes that in their differing interpretations of the key regulatory term "spent materials," Howmet and EPA "appear to agree that the phrase 'the purpose' should be construed in the singular, and contemplate a singular purpose."[10]  Notwithstanding this statement, the EAB analyzes whether the term "purpose" in the definition of "spent material" should be read to include the plural, and concludes that limiting the term to the singular "strikes us as the better reading of the regulations."[11]  This determination of the EAB in *Howmet* contravenes the basic rule of regulatory and statutory construction that singular terms, in this case the word "purpose" in the regulatory definition of "spent material," should be read in the plural, in this case to mean "purposes."

The RCRA regulations explicitly adopt this elemental canon of construction in 40 C.F.R § 260.3.[12]  Section 260.3, which was adopted as part of the original RCRA regulations on May 19, 1980,[13] reads:

> As used in parts 260 through 265 and 268 of this chapter . . .

---

[10] *Howmet*, at 29.

[11] *Id.* at 29, n. 41.

[12] *Howmet* notes that the RCRA regulatory violations at issue took place in New Jersey and Texas, both of which "have EPA-authorized hazardous waste management programs with regulations that mirror the federal RCRA regulations in relation to the issues on appeal." *Id.* at 4, n.2.  *Howmet*, however cites the federal versions of the regulations, and in particular cites § 260.3 when it discusses this issue.

[13] Hazardous Waste Management Systems: Revisions to Final Rule, 45 Fed. Reg. 33,066, 33,073 (May 19,1980) (codified at 40 C.F.R. § 260.3).

(b) words in the singular include the plural . . . .

The relevant definition of spent material discussed above is found at 40 C.F.R. 261.1(c)(1). Thus, it falls within the regulatory sections specifically cited in § 260.3, and pursuant to § 260.3's clear direction, the word "purpose" must be interpreted to include "purposes." In addition, § 260.3 was already on the books in 1985 when EPA adopted the new "spent material" definition at issue in *Howmet*, and this new definition, including its phrase "purpose for which it was produced" must be interpreted in light of the already-existing regulation at § 260.3. It is arbitrary and capricious for the EAB to ignore the plain meaning and explicit language of EPA's own rules.

Section 260.3 generally reflects the basic canon of statutory construction set forth at the opening of the United States Code, which states that "words importing the singular include and apply to several persons, parties or things. . . ."[14] However, the language of § 260.3 is even more declarative and final than the language of this statutory section, because the RCRA regulatory provision omits the "unless the context declares otherwise" language included in the United States Code.

The EAB in *Howmet* rejects this elemental principle of construction, allegedly because the "regulatory context [associated with the adoption of the 'spent materials' definition] strongly suggests that a deliberate choice was made [by EPA] in favor of singular usage."[15] The EAB's analysis on this point is flawed. Section 260.3, adopted in 1980, should not have been given the

---

[14] 1 U.S.C. § 1 (2007). *Accord, Central & Southern Motor Freight Tariff Assn, Inc., v. United States*, 843 F.2d 886, 894 (6th Cir. 1988); *Public Citizen v. Mieta*, 340 F.3d 39, 54 (D.C. Cir. 2003) (interpreting the word "tire" in the Transportation, Recall, Enhancement, Accountability and Documentation Act (TREAD) to include "tires").

[15] *Howmet*, at 29, n.41.

footnoted, afterthought status given to it by the EAB.  Instead, it should have been an integral

part of the EAB's analysis as to not only what the plain language of the "spent materials"

definition means—which Howmet correctly asserts in its Motion for Summary Judgment should

be determinative—but also what the "regulatory context" was in 1985 when the relevant

regulatory definition of "spent materials" was adopted.  If the EAB had properly analyzed the

regulatory history discussed in detail below in conjunction with § 260.3, it would have

determined that the term "purpose" not only could , but must, be read to include the plural

"purposes."  The result would be that the definition of "spent material," and EPA's regulatory

jurisdiction over "wastes," would not extend to subsequent uses of products until such products

are no longer used for any of the legitimate purposes for which they were produced.  For that

reason, Howmet's Motion for Summary Judgment should be granted.

   **B. The Regulatory History of EPA's Definition of Solid Waste, Including the
      Adoption of the Key Regulatory Term "Spent Materials" in 1985, Demonstrates
      that The Use of a Product for Multiple, Legitimate Purposes is Not the
      Management of a Solid Waste.**

   The original definition of solid waste rule adopted by EPA in 1980 was built on the

flawed premise that even when a product was legitimately used for multiple purposes, products

became wastes if they had been used once and "sometimes are discarded."[16]  Petitions for review

were filed in the District of Columbia Circuit in response to this overbroad and unlawful rule.[17]

In a 1983 proposal designed to remedy the overbreadth of the 1980 rule, EPA recognized certain

---

   [16] Hazardous Waste Management System: Identification and Listing of Hazardous Waste,
Final Rule, Interim Final Rule, 45 Fed. Reg. 33,084, 33,093 (May 19, 1980) (codified at 40
C.F.R. § 261.2(b)(2) (1980)).

   [17] *See* Hazardous Waste Management System: General; Identification and Listing of
Hazardous Waste, Proposed Rule, 48 Fed. Reg. 14,475, n.4 (April 4, 1983).

fundamental problems with its 1980 approach, *i.e.*, that the "sometimes discarded" test "sweeps many product-like materials into the solid waste net unless the material is never thrown away."[18] Accordingly, EPA proposed regulations in 1983 to narrow EPA's 1980 overbroad regulatory definition of solid waste and prevent the regulation of these "product-like" materials when they were reused or recycled.

In adopting a proposed definition of "spent materials" as part of its new approach to recycling in 1983, EPA stated that spent materials "are materials that have been used and are no longer fit for use without being regenerated, reclaimed or otherwise re-processed."[19] EPA's 1983 preamble reference to "no longer being fit for use" places absolutely no restriction on the types of subsequent uses that would make a material "not spent", as long as they do not require "regeneration, reclamation, or reprocessing" before the subsequent reuse. In particular, the 1983 preamble does not suggest in any way that the "initial deployment or application" of the product was even relevant—never mind determinative, as the EAB found in *Howmet*—to whether a product became a spent material when it was subsequently used for another purpose. Under the clear language of the 1983 preamble, if a previously used material can still be used for its original or another purpose without being regenerated, reclaimed or otherwise reprocessed, it is not a spent material. In order to try to capture this concept in regulatory language, EPA proposed in 1983 the following regulatory definition of "spent material": "any material that has been used and has served its original purpose."[20]

---

[18] *Id.* at 14,475.

[19] *Id.* at 14,476.

[20] *Id.* at 14,508 (proposing 40 C.F.R. § 261.2(b)(1)).

In 1985, when it finalized the new regulatory definition of solid waste, EPA repeated its 1983 preamble language that spelled out EPA's intentions regarding what constituted a "spent material," stating that "we are continuing to define spent materials as those materials that have been used and are no longer fit for use without being regenerated, reclaimed or otherwise reprocessed."[21]  EPA admitted at that time, however, that its proposed 1983 regulatory language in proposed 40 C.F.R. § 261.2(b)(1) had been flawed.  EPA stated that its reference to "original purpose" in the 1983 proposed regulatory language "was ambiguous when applied to situations where a material can be used further without being reclaimed, but the further use is not identical to the initial use."[22]  Put differently, EPA explicitly recognized when it adopted the 1985 rule that a second use, after the "initial deployment of a product" in its first use, was not the management of a "spent material," but was instead the subsequent, legitimate use of a product (and not subject to RCRA regulation).  This is the very question at issue in *Howmet*.  As was the case in EPA's 1983 preamble proposal, nowhere does EPA's 1985 final rule preamble or EPA's 1985 final rule itself contain any requirement that once the initial deployment of a product was completed, the product generally became a spent material, or any other similar limitation on subsequent uses.

EPA provided an example in the 1985 preamble to illustrate that a product used for an additional purpose is not within EPA's RCRA jurisdiction:  "An example of this is where solvents used to clean circuit boards are not [sic] longer pure enough for that continued use, but are still pure enough for use as metal degreasing.  The practice is simply continued use of a

---

[21] Hazardous Waste Management System; Definition of Solid Waste, Final Rule, 50 Fed. Reg. 614, 624 (January 4, 1985).

[22] *Id.*

solvent (This is analogous to using/reusing a secondary material as an effective substitute for commercial products)."[23]  By its terms, this scenario is presented by EPA as an *example*. Nowhere in the 1985 preamble does EPA state, imply or suggest that this example was the *only* factual situation where a "subsequent" use of a product would not involve management of a spent material.  EPA then adopted a new definition of "spent material" meant to capture the concept that products can be used for multiple purposes without becoming wastes: "any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced."[24]

The EAB in *Howmet*, however, paints a distorted and revisionist picture of the "spent materials" definition and its regulatory history.  The EAB attempts to argue that the 1983 proposed rule and the 1985 rule's final language regarding spent materials were not meant to be significant departures from the 1980 rule.  "As is self-evident, the distinction between this orientation and the one under the 1980 rule is not dramatic."[25]  This position is not "self-evident" at all; it is unsupported, and in fact absurd, in light of the fact that (1) the 1980 rule did not contain the "spent materials" concept, and (2) the 1983 proposed rule, and the 1985 final rule, were deliberately designed, under the threat of a pending lawsuit, to adopt an entirely different regulatory definition of solid waste because the 1980 regulation was overly broad and swept "many product-like materials into the solid waste net."[26]

---

[23] *Id.*

[24] *Id.* (codified at 40 C.F.R. § 261.1 (c)(1) (1985)).

[25] *Howmet*, at 26.

[26] 48 Fed. Reg. at 14,475.

When properly read against the backdrop of the regulatory history, EPA's 1985 "spent material" definition as adopted and in effect today—"any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing"—should be interpreted to recognize that the use of a product for multiple, legitimate purposes is not the management of a spent material, and not subject to EPA regulation as a hazardous waste.[27]

## IV.    CONCLUSION

For the foregoing reasons, and for the reasons set forth in Howmet's Motion for Summary Judgment, the Court should grant Howmet's Motion.


Dated:  August 25, 2008


                                    Respectfully Submitted,

                                    Donald J. Patterson, Jr.
                                    Beveridge & Diamond, P.C.
                                    1350 I Street, N.W., Suite 700
                                    Washington, DC 20005
                                    (202) 789-6032

                                    Counsel for Amicus Curiae the
                                    Alliance of Automobile Manufacturers

---

[27] The EAB's interpretation of the definition of "spent material" would improperly and unlawfully transform the regulatory language "purpose for which it was produced" into "purpose for which it was purchased."

**UNITED STATES DISTRICT COURT**
**FOR THE  DISTRICT OF DISTRICT OF COLUMBIA**

HOWMET CORP.,
    Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and
STEPHEN L. JOHNSON,
ADMINISTRATOR, U.S. EPA,
    Defendants.

Civil Action No. 1:07-cv-01306 (EGS)

## CERTIFICATE OF SERVICE

    I hereby certify that the Alliance of Automobile Manufacturer's Brief of *Amicus Curiae*, has been filed via email on this 22nd day of August, 2008.  In addition, true and correct copies of the foregoing motion were served on the following counsel of record, pursuant to the Federal Rules of Civil Procedure, via e-mail and via first-class mail, postage pre-paid.

**Attorneys Representing Plaintiff:**

Bryan J. Moore
VINSON & ELKINS, LLP
2801 Via Fortuna
Suite 100
Austin, TX 78746
(512) 542-8729
Email: bmoore@velaw.com

Mara Elizabeth Zimmerman
VINSON & ELKINS, LLP
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, DC 20004-1008
(202) 639-6778
Email: mzimmerman@velaw.com

**Attorney Representing Defendants**:

Angeline Purdy
U.S. DEPARTMENT OF JUSTICE
Environmental Defense Section
601 D Street, NW
Suite 8000
Washington, DC 20004
(202) 514-0996
Fax: (202) 514-8865
Email: angeline.purdy@usdoj.gov

Date: 8/22/2008

Jennifer Abdella